684 A.2d 845

**COMMISSIONER OF LABOR AND INDUSTRY**

v.

**BETHLEHEM STEEL CORPORATION.**

**No. 131, Sept. Term, 1995.**

Court of Appeals of Maryland.

Nov. 14, 1996.

---

18

Jonathan R. Krasnoff, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on brief), Baltimore, for Petitioner.

Eric Hemmendinger (Earle K. Shawe, Shawe & Rosenthal, on brief), Baltimore, for Respondent.

Argued before MURPHY,* C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

KARWACKI, Judge.

## I.

The issue presented in this case is whether the Respondent, Bethlehem Steel Corporation (hereinafter "Bethlehem"), by permitting a deteriorating toaster oven to exist and remain in an employee lunch room, committed both a serious and a repeated violation of Maryland's Occupational Safety and Health Act of 1973, Maryland Code (1957, 1985 Repl.Vol., 1990 Cum.Supp.),[1] Article 89 §§ 28–49B and, specifically, COMAR 09.12.31.U–1(1) to (2) and 29 C.F.R. § 1910.303(b)(1).[2]

## II.

The facts are generally undisputed. On August 17, 1990, Bethlehem employee Raymond Pritts, along with three other co-workers, left their work stations to cool down in the Tundish Lunch Room located in Bethlehem's Sparrows Point plant. The room contained an ice machine next to a floor-mounted air conditioner on top of which was a Hamilton Beach toaster oven. Bethlehem employees supplied the oven several years earlier for their own use.

---

* Murphy, C.J., now retired, participated in the hearing and conference of this case while an active member of this Court; after being recalled pursuant to the Constitution, Article IV, Section 3A, he also participated in the decision and adoption of this opinion.

1. Unless otherwise indicated, all statutory references shall hereinafter be to the Maryland Occupational Safety Act of 1973, formerly codified in Article 89 of the Maryland Code, as it was in force at the time of the events prompting this litigation. The Act is currently codified at Md. Code (1991), § 5–101 *et seq.* of the Labor and Employment Article.

2. COMAR 09.12.31.U–1(1) incorporates by reference 29 C.F.R. § 1910.304(b)(1), effective November 9, 1981 (8:22 Md. R. 127).

Pritts, who fellow employees described as "perspiring heavily," sat down on a wooden bench next to the air conditioning unit and rested his arm on the toaster oven. According to witnesses, he then stood straight up, began shaking, and quickly collapsed to the floor. Responding paramedics found Pritts in full cardiac arrest and immediately began CPR. After approximately thirty minutes, Pritts was transported to the Francis Scott Key Medical Center where he was later pronounced dead. The cause of death was cardiac arrest induced by electrocution.[3]

Maryland Occupational Safety and Health Administration (hereinafter "MOSHA") inspector James Barry conducted an investigation that same day. Subsequently, both Barry and Craig Lowry, Chief of MOSHA Services, concluded that due to the toaster oven's condition, its exterior was capable of carrying a lethal electric charge.

Based upon its investigation, MOSHA issued four citations,[4] including one for an alleged violation of 29 C.F.R. § 1910.303(b)(1), which provides in pertinent part:

*"Examinations, installation, and use of equipment—(1) Examination.* Electrical equipment shall be free from recognized hazards that are likely to cause death or serious physical harm to employees...."

MOSHA concluded that the citation was a serious and a repeated violation under § 40(a) & (b), which provide:

"(a) *Willful or repeated violations.*—Any employer who willfully or repeatedly violates any provision of this subtitle or any rule, regulation, standard, or order promulgated pursuant to this subtitle may be assessed a civil penalty not to exceed $10,000.00 for each violation.

(b) *Serious violations.*—Any employer who has received a citation for a serious violation of any provision of this

---

3. Pritts apparently had a history of heart trouble and was scheduled for bypass surgery in the near future.

4. Only that citation alleging a serious and a repeated violation of 29 C.F.R. § 1910.303(b)(1) is here at issue.

subtitle, or of any rule, regulation, standard, or order promulgated pursuant to this subtitle shall be assessed a civil penalty not to exceed $1,000.00 for each such violation.

For purposes of this subsection, a serious violation shall be deemed to exist in a place of employment if there is a substantial probability that death or serious physical harm could result from a condition which exists or from one or more practices, means, methods, operations, or processes which have been adopted or are in use in such place of employment unless the employer did not and could not with the exercise of reasonable diligence, know of the presence of the violation."

MOSHA accordingly assessed a penalty of $3,460.00. Bethlehem contested the citations, and the Commissioner appointed a hearing examiner to conduct a hearing on the charges.[5] The hearing examiner recommended that three of the citations, including the one for an alleged violation of 29 C.F.R. § 1910.303(b)(1), be dismissed. Rejecting that recommendation, the Commissioner held that the hearing examiner erroneously limited the application of § 1910.303(b)(1) to the *installation* of electrical equipment and concluded that "the most logical reading of the standard is that an employer keep equipment free from recognized hazards throughout its life in the plant and not merely at the moment it is installed." The Commissioner also noted that the toaster oven's condition would have alerted a reasonably prudent employer to the presence of an electric shock hazard, necessitating repair or replacement of the device.

Upon judicial review, the Circuit Court for Baltimore County reversed the Commissioner's ruling that Bethlehem committed a serious and a repeated violation of 29 C.F.R. § 1910.303(b)(1) and remanded the case to allow the Commissioner to prove whether Bethlehem committed a "non-serious" violation.

---

5. Appointment of a hearing examiner is authorized by Art. 89 § 37(d). In its opinion in the instant case, the Court of Special Appeals erroneously referred to the hearing examiner as an Administrative Law Judge.

The Court of Special Appeals reversed that judgment, opining that the circuit court "supplant[ed] its conclusion for that of the Commissioner," but remanded the case so that MOSHA would have the opportunity to prove whether Bethlehem "knew or should have known of the hazard through reasonable diligence." The court further held that "a finding of substantial similarity between the violations is necessary before enhanced penalties may be sanctioned for a 'repeated' violation." We issued a writ of certiorari to address the important evidentiary questions raised in this case.

### III.

The purpose of Maryland's Occupational Safety Act is to "assure as far as possible every working man and woman in the State of Maryland safe and healthful working conditions and to preserve our human resources[.]" § 28(c). In that regard, employers are required to "(1) furnish each of his employees employment and a place of employment which are safe and healthful as well as free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees, and (2) comply with the rules, regulations, standards and orders promulgated under this subtitle." § 32(a).

Consonant with these objectives, the Commissioner of Labor and Industry is empowered to, among other things, "prescribe such rules and regulations as he may deem necessary to carry out his responsibilities." § 30(a). In addition, the Commissioner, or his authorized representative, has the authority to issue citations to non-complying employers, § 36(a), and if necessary, assess civil penalties against those employers to enforce compliance. § 37(a)-(b).

An employer cited under the Act is entitled to contest the citation before the Commissioner or a Commissioner-appointed hearing examiner. § 37(c). Following a request from the employer, or upon the Commissioner's own initiative, the hearing examiner's report is subject to further

review by the Commissioner himself.[6] § 37(d). As with most administrative decisions, the Commissioner's decision is subject to "substantial evidence" review. § 38(a). Therefore, an order of the Commissioner of Labor and Industry must be upheld on judicial review if it is not legally erroneous and reasonably based upon substantial evidence. *See Younkers v. Prince George's County,* 333 Md. 14, 18–19, 633 A.2d 861, 863 (1993) (and cases cited therein). In short, reviewing courts must not substitute their fact-finding for that of the Commissioner when the latter's conclusions are substantially supported by the evidentiary record. With these principles in mind, we shall now address the Commissioner's conclusion that Bethlehem engaged in both a serious and a repeated violation of 29 C.F.R. § 1910.303(b)(1).

### Serious Violation

### A.

■ ▪Although an issue earlier raised, at this juncture neither party seriously disputes the applicability of 29 C.F.R. § 1910.303(b)(1) to the facts of the instant case. We nonetheless feel compelled to address the regulation's general applicability for the reason that substantial evidence review is unnecessary if the agency failed to apply the correct statutory or regulatory standard to the facts before it. *Cf. Younkers, supra,* 333 Md. at 19, 633 A.2d at 863 (reviewing court is under no constraint to reverse an administrative decision which is premised solely on an erroneous conclusion of law). While we hold that the Commissioner's reliance upon 29 C.F.R. § 1910.303(b)(1) in the case *sub judice* was proper, an explanation will serve future cases well.

■ The Commissioner posits that all electrical equipment present and in use in the employer's workplace falls within the ambit of the regulation, while Bethlehem would draw a distinc-

---

6. The hearing examiner's decision becomes a final order of the Commissioner after 15 days if neither party seeks review of that decision. § 37(d).

tion between "industrial" and "non-industrial" equipment, such as, in this case, employee-owned personal appliances.

■ Rejecting Bethlehem's position, the Court of Special Appeals reasoned:

"[w]e think it is clear that ownership is not, nor should it be, the determinative factor in cases involving appliances brought into the workplace by employees. To conclude otherwise would be in direct conflict with the intent of the general duty clause contained in Md.Code (1974, 1991 Repl. Vol.) Title 5, Subtitle 1, § 5–104(a) of the Labor and Employment Article,[7] which requires that 'each employer shall provide each employee of the employer with employment and a place of employment that are: (1) safe and healthful[.]' "

*Commissioner of Labor & Indus. v. Bethlehem Steel Corp.*, 106 Md.App. 243, 255, 664 A.2d 411, 417 (1995). We agree. 29 C.F.R. § 1910.303(b)(1) fails to draw any distinction between electrical hazards created by employers versus those created by employees. It simply commands that "[e]lectrical equipment shall be free from recognized hazards that are likely to cause death or serious physical harm to employees." If an employer fails to abate an electrical hazard that it knows or should know creates a risk of substantial injury or death to its employees, the employer has committed a serious violation of the Act under § 40(b), and is subject to the Act's penalty provisions. Notice, either actual or constructive, is the gravamen of employer responsibility under the Act; notice of risk, regardless of source, creates a concomitant responsibility to abate the risk.[8]

The intermediate appellate court, however, did caution that:

---

**7.** The Court of Special Appeals erroneously cited to Md.Code. (1974, 1991 Repl.Vol.), § 5–104(a) of the Labor and Employment Article. As we have said, however, Md.Code (1957, 1985 Repl.Vol., 1990 Cum. Supp.), Art. 89, § 32(a) was the general duty clause in force at the time of the subject citations. The differences between the two clauses are substantively insignificant.

**8.** In his opinion, the Commissioner cogently said:

"[i]t would be an undue burden to make the employer responsible for [personal items brought to the workplace by employees].... We think a practical standard would be that the employer would not be responsible under the [Act] for personal items brought to the workplace by an employee for the exclusive personal use by that employee if the employer has no actual or constructive knowledge that the item is being used by or is available for or used by other employees. Falling within that exception would be such things as desk lamps, desk clocks, radios, and other common workplace accessories that other employees would ordinarily recognize as being for the personal use and under the owner's personal control and not for the common use or operation by other employees."

106 Md.App. at 256–57, 664 A.2d at 418. We reject the notion that 29 C.F.R. § 1910.303(b)(1) excludes any particular group of employee-owned devices from its operation. The unambiguous language of the regulation does not, and we cannot, make exception for such devices. *Cf. Dodds v. Shamer*, 339 Md. 540, 554, 663 A.2d 1318, 1325 (1995) (citing *State v. Zitomer*, 275 Md. 534, 540, 341 A.2d 789, 793 (1975)).

Without question, the Act places the onus of general workplace safety squarely on the employer's shoulders, § 32(a), and 29 C.F.R. § 1910.303(b)(1) specifically charges an employer with the duty to see that "[e]lectrical equipment shall be free from recognized hazards that are likely to cause death or serious physical harm to employees." Where an employer lacks actual or constructive knowledge that an employee-owned device poses such a threat to workplace safety, § 40(b) liability fails to exist. As we shall discuss, *infra*, there was substantial evidence to support the conclusion that Bethlehem did possess such knowledge, putting it on notice that in order

"[w]ell settled principles of occupational safety and health law permit an employer to be held liable for a safety violation created by one of its employees. As a practical matter, it is often an employee who creates a hazard for which an employer is cited. For example, it is typically an employee who fails to shore a trench or install a guardrail."

to comply with 29 C.F.R. § 1910.303(b)(1), remedial measures were necessary.

## B.

Turning to the question of whether substantial evidence supports the Commissioner's conclusion that Bethlehem knew or should have known that the toaster oven posed a risk of serious injury or death to Bethlehem's employees, testimony taken before the hearing examiner is illustrative. Describing photographs of the toaster oven he took immediately following the incident, James Barry testified that the oven was wrapped in duct tape, rusting, and oozing overcooked materials from the rear. Barry also noted that the oven employed neither a grounded nor a polarized plug, which, in the event of a short circuit (such as the one that killed Pritts), would "trip out the circuit breaker," cutting off the flow of electricity to the unit. Barry also testified that, based on his investigation, he learned that Bethlehem supervisory personnel regularly entered the Tundish lunch room to retrieve ice and that the oven was in plain view of anyone entering the room. Bethlehem employee William Fischer similarly testified that supervisors would

"come in [the Tundish lunch room] every morning to put the—on the bulletin board—I mean on the blackboard, they put on there what job everybody's got and what tonnage they're going to be working on. Plus they come in there to get ice and they come there to give our safety meetings once a week."

Based upon photographs he took of the toaster oven and his own examination, Craig Lowry also testified that the oven was wrapped in duct tape. He opined that carbon build-up on the unit's cleaning hatch and a collection of other materials on its interior was indicative that the unit "may not have been cleaned for a long time."

Lowry also noted that the unit contained a piece of insulation not part of the original product, but installed by someone

other than the manufacturer.[9]   Most importantly, Lowry testified that a glass tube containing the oven's heating element was fractured, allowing the element probe to dislodge from its ceramic insulator and contact the oven's surface.   As a result, electricity was permitted to flow to the oven's exterior.   Lowry indicated that a grounded plug may have prevented the accident.

In a memorandum dated August 17, 1990, Lowry related his observations and findings to James Barry.   In that memorandum, he concluded that

"[t]he Hamilton Beach Toaster Oven/Broiler ... was in disrepair and capable of producing the flow of electrical energy to the normally non-current carrying exterior metal case.   Current flowing from a standard 120 vac to 15–20 amp receptacle through the metal case of this appliance in a fault situation would have been more than adequate to cause the death of an individual."

Based upon the above testimony and documentary evidence, the Commissioner concluded that:

"the outer condition of the toaster oven was sufficiently dilapidated to put a reasonable person on notice that the device should be examined....   Had [Bethlehem] responded to this obvious warning of poor condition, it could have discovered easily that the lower heating element was sagging, permitting its electrical probe to touch the outside case.   That discovery would have been sufficient to put [Bethlehem] on notice that the device presented a shock hazard and should be repaired or removed from service."

The circuit court disagreed.   Noting that the Commissioner based his finding that the toaster oven was a serious violation under the Act on the unit's neglected condition, the court faulted the Commissioner's conclusion that "[t]he [duct] tape still served as a signal of deterioration or damage and, given that the device was electrical in nature, such a signal warrants

---

9.  Lowry did not offer an opinion as to why he thought the foreign insulation had been installed in the oven.

further investigation." Although the court agreed that the tape served as a signal of deterioration, it thought unreasonable to

"conclude that, based solely upon the existence of that duct tape, an employer exercising due diligence must assume that the oven's interior might also have deteriorated or been damaged to such an extent that it was "electrifying" its exterior. It is common knowledge that duct tape is not used to insulate a surface from transmitting electrical impulses whereas it frequently is used to simply hold things together. *Therefore, an argument could be made that the existence of the duct tape contra-indicated the likelihood of electrical shock.*" (Emphasis added).

Both the circuit court and the Commissioner agree that the oven's exterior was deteriorating, but disagree on the inferences to be drawn from that deterioration. The Commissioner concluded that a reasonably prudent employer would have inspected the device further, and upon inspection, would have discovered the displaced heating coil. In short, Bethlehem had constructive knowledge of the electrical hazard. The circuit court, however, thought it unreasonable "that an employer exercising due diligence must assume" that exterior deterioration signals a corresponding interior deterioration sufficient to pose an electric shock threat.

We think, however, the Commissioner merely suggests that had Bethlehem exercised due diligence, it would have had to assume nothing; the threat was easily discernable. Although the inferential step between a deteriorating toaster oven and the threat of an electrical hazard may be long, we are not prepared to say that it is unreasonable. Indeed, the circuit court expressly acknowledged that the point was "arguable," or that conflicting inferences could be drawn from the oven's physical appearance. The Commissioner was entitled to draw the inferences that he did and the circuit court should have accorded those inferences due deference. *Cf. Younkers, supra,* 333 Md. at 19, 633 A.2d at 863; *Snowden v. Mayor & City Council of Baltimore,* 224 Md. 443, 448, 168 A.2d 390, 392 (1961) (agency is the one to whom is committed the drawing of

whatever inferences reasonably are to be drawn from the factual evidence).

Viewing the record as a whole, and in the Commissioner's favor as we must, *Motor Vehicle Admin. v. Lindsay*, 309 Md. 557, 563, 525 A.2d 1051, 1054 (1987); *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 513, 390 A.2d 1119, 1124 (1978), we hold that it contains substantial evidence to support the Commissioner's finding that Bethlehem engaged in a serious violation of 29 C.F.R. § 1910.303(b)(1) and that the Court of Special Appeals correctly concluded that "the trial court erred by supplanting its conclusion for that of the Commissioner." *Bethlehem Steel*, 106 Md.App. at 259, 664 A.2d at 419. Unlike the intermediate appellate court, we see no need to remand this portion of the case for further proceedings. It is clear from the record that the Commissioner correctly recognized that the burden to prove the violation fell to MOSHA, and that MOSHA met that burden.

## IV.

### Repeat Violation

#### A.

In addition to charging Bethlehem with a serious violation of 29 C.F.R. § 1910.303(b)(1), MOSHA also cited the company for a repeated violation of that same regulation under § 40(a). As we have said, § 40(a) provides for a civil fine of up to $10,000 if an employer "willfully or repeatedly violates any provision of" the Act.

The Maryland Occupational Safety and Health Act is modeled after its federal counterpart [10] and we therefore look to federal cases for guidance. *Bethlehem Steel Corp. v. Comm'r of Labor and Industry*, 339 Md. 323, 328, 662 A.2d 256, 258 (1995); *J.I. Hass Co. v. Dep't of Licensing & Regulation*, 275 Md. 321, 330, 340 A.2d 255, 260 (1975). Section 40(a) of the

---

**10.** The federal Occupational Safety and Health Act of 1970 ("OSHA") is codified at 29 U.S.C. § 651 *et seq.* (1994).

Maryland Act mirrors 29 U.S.C. § 666(a) of the federal Act.[11] Neither act, however, defines "repeatedly."

Uniformally, the jurisdictions that have considered the question agree that "a violation is 'repeated' if (1) the same standard has been violated more than once and (2) there is a 'substantial similarity of violative elements' between the current and prior violations," and (3) the prior citation on which the repeated violation is based has become a final order of the Commissioner. *D & S Grading Co., Inc. v. Secretary of Labor,* 899 F.2d 1145, 1147 (11th Cir.1990) (citing *J.L. Foti Constr. Co. v. OSHRC,* 687 F.2d 853, 856–57 (6th Cir.1982); *Dun–Par Engineered Form Co. v. Marshall,* 676 F.2d 1333, 1337 (10th Cir.1982); *Bunge Corp. v. Secretary of Labor,* 638 F.2d 831, 837 (5th Cir.1981); *George Hyman Constr. Co. v. OSHRC,* 582 F.2d 834, 839 (4th Cir.1978); *Todd Shipyards Corp. v. Secretary of Labor,* 566 F.2d 1327, 1330, n. 5 (9th Cir.1977)). *See also Reich v. D.M. Sabia Co.,* 90 F.3d 854, 856 (3rd Cir.1996); *Kent Nowlin Constr. Co. v. OSHRC,* 648 F.2d 1278, 1281–82 (10th Cir.1981). We agree.

During the relevant period, § 40(a) of the Maryland Act and 29 U.S.C. § 666(a) provided for a $10,000 civil fine if any employer willfully *or* repeatedly violated the acts' requirements.[12] A literal reading of both acts reveals that the enhanced penalty provision was aimed at violations that are either willful *or* repeated. *George Hyman Constr. Co., supra,* 582 F.2d at 839. The use of the disjunctive "or" suggests two

---

**11.** 29 U.S.C. § 666(a) provides that:

"Any employer who willfully or repeatedly violates the requirements of section 5 of this Act [29 U.S.C. § 654], any standard, rule, or order promulgated pursuant to section 6 of this Act [29 U.S.C. § 655], or regulations prescribed pursuant to this Act may be assessed a civil penalty of not more than $70,000 for each violation, but not less than $5,000 for each willful violation."

**12.** The civil fine under both the Maryland and Federal Occupational Safety and Health Acts for willful or repeated violations has a current maximum of $70,000, but a minimum of $5000 for willful violations. Md.Code (1957, 1991 Repl.Vol., 1996 Cum.Supp.) Labor and Employment § 5–810(a)(2) to (3); 29 U.S.C. § 666(a) (1996).

alternative theories upon which an enhanced penalty may be predicated. *Id.* Such a construction is consistent with Congressional intent to "permit enhanced penalties when employers permit violations of the same standard to occur several times, even though the employer's intent or negligence falls short of the 'willful' level." *Kent Nowlin Constr. Co., supra,* 648 F.2d at 1281.[13] The purpose of 29 U.S.C. § 666(a), and by implication, Maryland's § 40(a), is to, *inter alia,* encourage employers who have previously been cited for a violation to take adequate remedial measures to prevent recurrence of the violation. 648 F.2d at 1282. Under this construction, enhanced penalties should come into play whenever an employer fails to adequately respond to a citation, *Dun–Par Engineered Form, supra,* 676 F.2d at 1337, regardless of whether the failure was "willful."

### B.

The instant fray is joined over the parties' respective burdens of proof when a § 40(a), or a repeated citation, is challenged. Prior to the August 17, 1990 incident which gave rise to the citation(s) challenged here, Bethlehem was thrice cited for violations of 29 C.F.R. § 1910.303(b)(1). Citations issued on December 14, 1987 and June 17, 1990, respectively alleged that wiring on an overhead crane was frayed and dry rotted, and on the latter citation, panel wiring improperly spliced. A January 19, 1989 citation alleged that Bethlehem improperly exposed two 440–volt floor-mounted electric motors to water and chemicals. All three citations alleged that the hazards were "likely to cause death or serious physical harm to employees."

In his opinion, the Commissioner noted that "[t]he record shows that on [at least] two prior occasions MOSHA had cited

---

**13.** The court in *Kent Nowlin Constr. Co. v. OSHRC,* 648 F.2d 1278 (10th Cir.1981) based its conclusion upon H.R.Rep. No. 91–1291, 91st Cong., 2d Sess. 26 (1970) wherein the committee, in discussing the enhanced penalty provisions, stated that "[o]ther than willful violations, the violator's intent should not be a pertinent factor in the original assessment of penalties." 648 F.2d at 1282.

[Bethlehem] for violating Standard 29 C.F.R. § 1910.303(b)(1) by having electrical equipment with recognized hazards." Relying on *Potlatch Corp.,* 7 O.S.H. Cas. (BNA) 1061 (R.C.1979), he concluded that "[t]his is sufficient to make a prima facie case that the violation alleged here was repeat." Despite Bethlehem's argument that the conditions giving rise to the 29 C.F.R. § 1910.303(b)(1) hazard were so disparate from the earlier citations so as to preclude notice to Bethlehem of a repeat violation, the Commissioner opined that

> "[t]he courts have recognized, however, that where an employer has been previously cited for a particular hazard, *a subsequent citation for the same hazard is appropriately characterized as repeat, even if different conditions gave rise to the hazard....* Accordingly, the Commissioner will affirm the violation as repeat." (Emphasis added).

We disagree. The federal cases clearly hold that in order to sustain a repeated violation citation under 29 U.S.C. § 666(a), there must be a "substantial similarity of violative elements between the current and prior violations." *See D & S Grading, supra,* 899 F.2d at 1147. The crux of the present matter is to whom falls the burden of proving "substantial similarity" and what is necessarily required to meet that burden.

In *Potlatch,* a majority of the federal Occupational Safety and Health Review Commission for the first time construed the word "repeatedly," as used in 29 U.S.C. § 666(a). In so doing, the Commission stated:

> "[t]he Secretary may establish a prima facie case of [substantial] similarity by showing that the prior and present violations are for failure to comply with the same standard. It is important to recognize that occupational safety and health standards range from those that designate specific means of preventing a hazard or hazards to those that either do not specify the means of preventing a hazard or apply to a variety of circumstances. Accordingly, in cases where the Secretary shows that the prior and present violations are for an employer's failure to comply with the same specific standard, it may be difficult for an employer to rebut the Secretary's prima facie showing of similarity.

This is true simply because in many instances the two violations must be substantially similar in nature in order to be violations of the same standard. However, in cases where both violations are for failure to comply with the same general standard, it may be relatively undemanding for the employer to rebut the Secretary's prima facie showing of similarity."

*Potlatch,* 7 O.S.H. Cas. (BNA) at 1063. In order to rebut such a *prima facie* case, the employer must show "disparate conditions *and* hazards associated with [the] violations of the same standard." *Id.*

The Commissioner invites this Court to adapt the *Potlatch* approach to the Maryland Act. We decline that invitation. As the Fifth Circuit observed in *Bunge, supra,* "[u]nder 5 U.S.C.A. § 556(d),[14] the proponent of a rule or order has the burden of proof, except as otherwise provided by statute. Absent a different allocation of the burden of persuasion by the substantive statute, the burden of production and persuasion remain with the Secretary," who must show the similarity of conditions associated with the present and antecedent violations. *Bunge,* 638 F.2d at 838.

The Commissioner correctly points out that the *Bunge* court predicated its holding on 5 U.S.C.A. § 556(d), for which there is no Maryland counterpart. This is of no moment. We have previously held "that the burden of proof is generally on the party asserting the affirmative of an issue before an administrative body." *Bernstein v. Real Estate Comm'n,* 221 Md. 221, 231, 156 A.2d 657, 662 (1959). Section 556(d) coincidentally reflects in the federal Administrative Procedure Act what has long been the law of this State with respect to burdens of proof in administrative hearings.

As the Commissioner acknowledges in his Reply Brief, federal law fails to make clear whether proving "substantial similarity" in the repeated violation context requires proving

---

**14.** 5 U.S.C.A. § 551 *et seq.* (1988 ed., Supp. V) is otherwise known as the federal Administrative Procedure Act.

the similarity of the conditions giving rise to the hazard that the standard seeks to abate, the similarity of the hazard itself, or a combination of the two. The answer to this question requires resort to the structure of the Act itself and the purpose underlying the enhanced penalty provisions.

The universe of OSHA and MOSHA rules and regulations is large and diverse. As the *Potlatch* Commission noted, safety standards may be quite specific, such as those that require the installation of handrails at construction sites, *see J.L. Foti Constr. Co., supra,* 687 F.2d at 855 n. 1, or quite general, such as those that require workplace cleanliness and sanitation. *See Bunge Corp., supra,* 638 F.2d at 833 n. 1. Similarly, certain of the Act's rules and regulations proscribe specific hazards, such as 29 C.F.R. § 1910.303(b)(1), at issue in the instant case, which requires employers to keep electrical equipment "free from recognized hazards likely to cause death or serious physical harm to employees." Others simply proscribe certain conditions, the hazard being presumed. *Cf. Lee Way Motor Freight, Inc. v. Secretary of Labor,* 511 F.2d 864, 869 (10th Cir.1975).[15] For example, 29 C.F.R. § 1926.500(d)(1), which requires that "[e]very open-sided floor or platform 6 feet or more above adjacent floor or ground level shall be guarded by a standard railing . . . ," is just such a regulation, the presumptive hazard being that of an employee fall.

We think the better approach is to burden MOSHA with proving substantial similarity between the conditions giving rise to the hazard in order to sustain a repeated violation under the Maryland Act. Clearly, when a rule or regulation mandates or proscribes very specific conduct, the burden is slight. A repeated violation under a very specific standard requires the present and antecedent conditions to be almost

---

**15.** In *Lee Way Motor Freight, Inc. v. Secretary of Labor,* 511 F.2d 864 (10th Cir.1975), the court said that "hazard, as such, need not be shown in order to show non-compliance with [29 C.F.R. § 1910.22(c) requiring handrails to prevent the hazards of open pits]. The standard presupposes the obvious, namely, that an open unguarded pit necessarily presents the hazard that someone may fall into it." 511 F.2d at 869.

identical. If an employer is cited twice for failing to construct proper railing on a construction site, the conditions giving rise to the presumed hazard of an employee fall are going to be virtually synonymous, i.e., the failure to construct proper railings. As the rule or regulation becomes more general in character, however, the burden will concomitantly increase. Thus, although 29 C.F.R. § 1910.303(b)(1) proscribes electrical equipment hazards, the conditions which can give rise to such hazards may be limitless.

The dissent relies heavily upon our holding in *Bethlehem Steel Corp. v. Commiss'r of Labor and Industry*, 339 Md. 323, 662 A.2d 256 (1995) (hereinafter *Bethlehem I* ), wherein we held that the Commissioner properly placed the burden of proof upon Bethlehem to prove that compliance with a specific safety standard was not feasible. The dissent suggests that *Bethlehem I* is analogous, if not controlling. We respectfully disagree for three reasons.

First, although *Bethlehem I* addressed the relative burdens of proof between the Commissioner and the cited employer, it did so in the context of proving the feasibility of compliance with the general and specific duty clauses of the Maryland Occupational Safety and Health Act. *See* Md.Code (1991, 1991 Repl.Vol., 1991 Supp.), §§ 5–104(a)(1)–(2) & 5–104(b)(1) of the Labor and Employment Article. We there held that when an employer is cited for violation of the general duty clause, the burden falls upon the *Commissioner* to prove that compliance with the rule or regulation is feasible. *Bethlehem I, 339* Md. at 328, 662 A.2d at 258. The same is true for an alleged violation under the specific duty clause, when the implicated rule or regulation fails to specify the means of compliance. *Id.* at 329, 662 A.2d at 259. Such a rule "is driven by the concern that absent fair notice of what is required or prohibited, there may be a violation of due process." *Id.,* 339 Md. at 329, 662 A.2d at 259 (and cases cited therein). When, however, a specific duty standard contains the method for abating workplace hazards, the burden of proving the infeasibility of the particular standard under the circumstances falls to the employer. *Id.,* 339 Md. at 329, 662 A.2d at 259. In the

instant case, the feasibility of compliance with 29 C.F.R. § 1910.303(b)(1) was neither raised nor argued below. In that regard, *Bethlehem I* is inapposite.

Second, even assuming *arguendo* that issue was raised below, 29 C.F.R. § 1910.303(b)(1) fails to prescribe the method of abating workplace electrical hazards. Under our holding in *Bethlehem I,* the burden of proving the feasibility of compliance would have fallen to the Commissioner in any event.

Finally, due process concerns aside, saddling the employer with the burden of proving the feasibility of compliance in those instances where the alleged violation was of rule or regulation prescribing a specific method of hazard abatement is perfectly consistent with the position we adopt in the instant case. Indeed, infeasibility is in the nature of an affirmative defense. As the party asserting the affirmative, the employer would naturally have the burden of proof. *See* Part II. B., *supra.*

As we said in Part IV. A. *supra,* the purpose of the enhanced penalty provision of § 40(a) of the Maryland Act is to ensure adequate employer response to previous citations. We think it is impossible to determine the propriety of an employer's response without first considering the underlying conditions that gave rise to the violation in the first instance. In situations where the conditions prompting the present citation are so disparate from those of the antecedent violation that the employer would not be on notice that his compliance efforts are insufficient, application of the enhanced penalty provisions would serve only to punish an employer who has made a good faith effort to observe the relevant regulation and correct any deficiencies brought to its attention. We do not think that this is the intent of the General Assembly in enacting § 40(a).

This is not to suggest that an employer may turn a blind eye to workplace hazards. To the contrary, a citation and abatement order apprises an employer of the necessity of corrective action and of seeking out and preventing similar hazards. §§ 36, 37 and 40. *See also Dun–Par Engineered*

*Form, supra,* 676 F.2d at 1337 (citing 29 U.S.C. §§ 666(a), (b), and (j)). We simply here recognize that while the Act requires employers to comply with its provisions and assure, as far as practicable, a safe working environment for its employees, it does not require employer omniscience in the area of workplace safety. *Cf. Brennan v. OSHRC,* 511 F.2d 1139, 1145 (9th Cir.1975) (holding that not requiring the Secretary to establish that an employer knew or should have known of the existence of an employee violation would in effect improperly make the employer strictly and absolutely liable for all violations). We can perceive of some situations where, notwithstanding a prior citation under a particular safety standard, an enhanced penalty would no more encourage employer compliance than if the original citation had never been issued.

We therefore hold that in order to establish a "repeated violation" under § 40(a), the Commissioner must prove, by a preponderance of the evidence, the substantial similarity between the conditions giving rise to the present and antecedent violations. A final order of the Commissioner under the same standard does not establish a *prima facie* case of a "repeated violation" in the Commissioner's favor. The burden of persuasion and burden of production remain firmly fixed upon the Commissioner throughout the administrative proceeding. *Bunge, supra,* 638 F.2d at 838.

In light of the principles articulated in this opinion, we shall affirm the intermediate appellate's court decision to remand the "repeated violation" portion of the case to allow the Commissioner the opportunity to apply the correct evidentiary standard to the facts of this case and to hear more evidence if necessary. This will necessarily involve determining whether the conditions leading to Bethlehem's most recent citation for violation of 29 C.F.R. § 1910.303(b)(1) were substantially similar to those for its previous violations of that same standard.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED IN PART AND REVERSED IN PART; CASE REMANDED TO THAT COURT WITH DIRECTIONS TO FURTHER REMAND THE CASE TO THE CIRCUIT*

*COURT FOR BALTIMORE COUNTY WITH INSTRUC-
TIONS TO REMAND IT TO THE COMMISSIONER OF
LABOR AND INDUSTRY FOR FURTHER PROCEED-
INGS CONSISTENT WITH THIS OPINION. COSTS IN
THIS COURT AND IN THE COURT OF SPECIAL AP-
PEALS TO BE DIVIDED EQUALLY BETWEEN PETI-
TIONER AND RESPONDENT.*

Concurring and Dissenting Opinion by CHASANOW, J., in
which RODOWSKY and RAKER, JJ., join.

CHASANOW, Judge, concurring and dissenting.

I concur with the majority's holding that the Commissioner
was correct in finding that the toaster oven that electrocuted
Raymond Pritts had "recognized hazards that are likely to
cause death or serious physical harm to employees" and that
this was a "serious" violation. My dissent is from the portion
of the majority's opinion that analyzes the procedure by which
a "repeated" violation should be determined and from the
failure to affirm the Commissioner's finding that Bethlehem
Steel Corporation committed a repeated violation.

## I.  THE PRIOR VIOLATIONS

At the evidentiary hearing Maryland Occupational Safety
and Health Administration (MOSHA) introduced three prior
citations for Bethlehem's violation of 29 C.F.R.
§ 1910.303(b)(1)[1]. That provision is a subsection of
§ 1910.303 which provides, in relevant part:

---

1. This federal standard is in effect in Maryland. Maryland operates a
federally approved State Occupational Safety and Health Plan, and the
Commissioner of Labor and Industry has adopted the federal safety
standards for enforcement in Maryland. Code of Maryland Regulations
(COMAR) 9.12.31. (1977, Supp.15–20). Hereafter, in citing to the
federal Occupational and Health Safety Standards, I shall omit the
citation to Title 29 of the Code of Federal Regulations. For example,
the standard in the violation charged in this case becomes
§ 1910.303(b)(1).

### "General requirements.

(a) *Approval.* The conductors and equipment required or permitted by this subpart shall be acceptable only if approved.

(b) *Examination, installation, and use of equipment*—(1) *Examination.* Electrical equipment shall be free from recognized hazards that are likely to cause death or serious physical harm to employees. Safety of equipment shall be determined using the following considerations:

(i) Suitability for installation and use in conformity with the provisions of this subpart. Suitability of equipment for an identified purpose may be evidenced by listing or labeling for that identified purpose.

(ii) Mechanical strength and durability, including, for parts designed to enclose and protect other equipment, the adequacy of the protection thus provided.

(iii) Electrical insulation.

(iv) Heating effects under conditions of use.

(v) Arcing effects.

(vi) Classification by type, size, voltage, current capacity, specific use.

(vii) Other factors which contribute to the practical safeguarding of employees using or likely to come in contact with the equipment." (Emphasis added).

Section 1910.303(b)(1) is a standard designed to prevent the hazard of electric shocks that are capable of causing death or serious physical harm. The standard seems to require two related duties of an employer. First, prior to installing electrical equipment, an employer should verify that the equipment is free from recognized hazards likely to cause death or serious physical harm. Second, electrical equipment with recognized hazards that are capable of causing death or serious physical harm should be made safe; this is the portion of the standard at issue in the instant case as well as in the prior violations. There may also be a third duty under this subsection that may require an employer to conduct reason-

able inspections of electrical equipment. In addition to the violations at issue in the instant case, Bethlehem was also charged with failure to inspect the toaster oven. The Commissioner of Labor and Industry found that this violation was not proven. In his written opinion, the Commissioner stated: "There is no other evidence [about inspections]. Accordingly, the Commissioner concludes that MOSH failed to show a failure to inspect." What the instant citation and the prior citations charged, however, was the failure to abate *recognized* hazards, not the failure to inspect electrical equipment.

Bethlehem had been issued three citations prior to the citation at issue. Each of those prior citations was issued for violating the same standard as the citation in the instant case. Taking the prior citations in inverse chronological order, the third prior citation was for a violation on May 14, 1990. The violation charged:

"29 CFR 1910.303(b)(1): Electrical equipment was not free from recognized hazards that were likely to cause death or serious physical harm to employees."

The *equipment* listed in the violations was two overhead bridge cranes and the *conditions* were "250 volt main hoist panel wiring was found to be dry rotted" and "250 volt power lead wiring in rear of bridge panel box was found to be frayed and dry rotted."

The second prior citation was for a violation occurring on August 4, 1988. The violation charged was:

"29 CFR 1910.303(b)(1): Electrical equipment was not free from recognized hazards that were likely to cause death or serious physical harm to employees."

The *equipment* listed was two 440 volt electric motors and the *condition* was "(2) floor mounted electric motors are exposed to water & chemical solution that may become energized."

The first prior citation was for a violation occurring on October 6, 1987. The violation charged was:

"29 CFR 1910.303(b)(1): Electrical equipment was not free from recognized hazards that were likely to cause death or serious physical harm to employees."

The *equipment* involved was three overhead bridge cranes and the *conditions* were "main hoist panel wiring was found to be dry rotted and corroded," "bridge panel wiring was improperly spliced," and "bridge panel wiring was found to be dry rotted and corroded." Each of these three prior violations was found to be a serious violation and each resulted in a fine, which Bethlehem paid.

At the evidentiary hearing in the instant case, James C. Barry, who had been an Occupational Safety and Health Inspector for 17 years, testified. When asked if the three prior violations were "substantially similar" to the violation in the instant case, Mr. Barry answered in the affirmative and stated:

"Certainly dry rotted wiring and corroded wiring could produce pretty much the same situation which would be contact with energized electrical parts and in such produce a serious injury to an employee."

## II. REPEATED VIOLATIONS

Under Maryland Code (1957, 1985 Repl.Vol.), Article 89, § 40(a), any employer who "repeatedly violates" any rule, regulation, or standard may be fined up to $10,000.00.[2] "Repeatedly" is not defined in the statute and has been the subject of some controversy. My disagreement with the majority is not in how it defines "repeatedly," but in its rejection of the Commissioner's determination, made in accord with the overwhelming weight of authority, that a prima facie

2. Maryland Code (1957, 1985 Repl.Vol.), Article 89, § 40(a) provides in relevant part:

"(a) *Willful or repeated violations.*—Any employer who willfully or repeatedly violates any provision of this subtitle or any rule, regulation, standard, or order promulgated pursuant to this subtitle may be assessed a civil penalty not to exceed $10,000.00 for each violation." Since the time of the violations at issue in this case, Art. 89 § 40(a) has been recodified as Md.Code (1991, 1996 Supp.), Labor & Employment, § 5–810(a)(2) and now permits a civil penalty not in excess of $70,-000.00 per violation.

case of a repeat violation was established by Bethlehem's prior violations of the same standard.

The definition of repeated violations adopted by the majority was formulated in the seminal case of *Secretary of Labor v. Potlatch Corp.,* 1979 OSHD (CCH) ¶ 23,294 (R.C.1979). *Potlatch* synthesized a definition of "repeated violation" which was later adopted by the overwhelming majority of courts. *See Reich v. D.M. Sabia Co.,* 90 F.3d 854, 857 n. 8 (3d Cir.1996) (stating that "[s]ince *Potlatch,* every other court of appeals which has addressed this issue has adopted the *Potlatch* definition"). The *Potlatch* definition of repeated violations is also adopted by the majority in the instant case. *Potlatch* both defined "repeated" violations and, as an integral part of the definition, established the procedure for determining how a repeated violation is established. *Potlatch* stated:

"Inasmuch as the announcement of authoritative guidelines is an important matter, we have thoroughly re-examined this issue in light of the decisions of the Fourth and Ninth Circuits, and we now announce the following principles.

A violation is repeated under section 17(a) of the Act if, at the time of the alleged repeated violation, there was a Commission final order against the same employer for a substantially similar violation."

*Potlatch* ¶ 23,294 at 28,171. Immediately following the definition of repeated violation, the *Potlatch* opinion explained the procedure for proving a substantially similar violation.

"The Secretary may establish substantial similarity in several ways. In cases arising under section 5(a)(2) of the Act, which states that each employer shall comply with occupational safety and health standards, the Secretary may establish a prima facie case of similarity by showing that the prior and present violations are for failure to comply with the same standard. It is important to recognize that occupational safety and health standards range from those that designate specific means of preventing a hazard or hazards to those that either do not specify the means of preventing a hazard or apply to a variety of circumstances. Accordingly,

in cases where the Secretary shows that the prior and present violations are for an employer's failure to comply with the same specific standard, it may be difficult for an employer to rebut the Secretary's prima facie showing of similarity. This is true simply because in many instances the two violations must be substantially similar in nature in order to be violations of the same standard. However, in cases where both violations are for failure to comply with the *same general standard*, it may be relatively undemanding for the employer to rebut the Secretary's prima facie showing of similarity. * * *

In the absence of evidence that the antecedent and present violations concern non-compliance with the same standard, the Secretary must present other evidence that the violations are substantially similar in nature. In this regard, we think that evidence that the violations involve similar hazards would be relevant. We assign weight to the similarity of the hazards for two reasons. First, a failure to do so would re-cast the phrase 'section 5 of this Act' in section 17(a) to read 'section 5(a)(2)' and thus preclude the possibility that an employer could repeatedly violate section 5(a)(1). Second, to hold that characterization as repeated is limited to subsequent violations of the same standard could lead to patently absurd results. For example, if two employees performing construction work such as painting were exposed to a 20 foot fall from an unguarded scaffold, the employer would be in violation of 29 C.F.R. § 1926.451(a)(4); a subsequent citation based on exposure of the same employees to a 20 foot fall while using the same unguarded scaffold to replace light bulbs would be a violation of 29 C.F.R. § 1910.28(a)(3). Under the 'same standard' restriction, however, the subsequent violation could not be classified as repeated." (Footnotes omitted).

*Potlatch* ¶ 23,294 at 28,171–72.

As previously noted, federal appellate courts that have confronted the issue have almost uniformly adopted the *Potlatch* definition, and there is no reason to believe that they would reject the *Potlatch* procedure of holding that there is a

prima facie repeated violation when there is a second violation of the same standard. *See Dun–Par Engineered Form Co. v. Marshall,* 676 F.2d 1333, 1338 (10th Cir.1982) (holding that a repeat violation is prima facie established by showing that the prior and present citation are for violation of the same standard).

Federal administrative decisions have uniformly adopted the *Potlatch* definition of repeated violations as well as the *Potlatch* decision holding that there is a prima facie violation when there is a prior violation of the same standard. *See, e.g., Amerisig Southeast, Inc.,* 1996 OSHD (CCH) ¶ 31,081 at 43,362 (R.C.1996) ("The Secretary may establish a prima facie case of substantial similarity by showing that the final order alleged a failure to comply with the same standard. The burden then shifts to the employer to rebut that showing."); *Mautz & Oren, Inc.,* 1993 OSHD (CCH) ¶ 29,986 at 41,069 (R.C.1993) ("Recently, the Commission reaffirmed the holding in *Potlatch* that the Secretary establishes a prima facie case of similarity by showing that both violations are of the same standard, as long as the standard at issue is not a general standard."); *Kulka Construction Management Corp.,* 1992 OSHD (CCH) ¶ 29,829 at 40,687–88 (R.C.1992) (citation omitted) (stating "Kulka had previously been cited for violations of the same standards at issue here . . ., [which] is sufficient to establish a prima facie case that the violations alleged here were repeated"); *Dole v. Consolidated Edison Company of New York, Inc.,* No. 89–3055 at 7 (O.S.H.R.C. Nov. 7, 1990) (available from CCH) (noting "[t]he Secretary establishes a prima facie case by showing that both violations are of the same standard").

The sole authority cited by the majority for rejecting the portion of the *Potlatch* decision pertaining to a prima facie violation is the fifteen-year-old case of *Bunge Corp. v. Secretary of Labor,* 638 F.2d 831 (5th Cir.1981). The quotation from *Bunge* relied on by the majority is: "Under 5 U.S.C.A. § 556(d), the proponent of a rule or order has the burden of proof, except as otherwise provided by statute. Absent a different allocation of the burden of persuasion by the sub-

stantive statute, both the burden of production and persuasion remain with the Secretary." 343 Md. at 34, 684 A.2d at 853 (quoting *Bunge,* 638 F.2d at 838). That statement, incidentally, is dicta because *Bunge* sustained the finding of a repeated violation. 638 F.2d at 837.

There are several reasons why the only case cited by the majority should not be considered persuasive authority in Maryland. It is obvious from the quotation that the statutory authority that is cited and relied on by the *Bunge* court is 5 U.S.C.A. § 556(d). As the majority acknowledges, there is no Maryland counterpart to that cited federal statute. Further, the majority cites no other court or administrative decision that follows *Bunge,* and as I have indicated, there are many, many decisions that disagree with *Bunge*'s rejection of *Potlatch*'s holding that a prima facie case of a repeated violation is established by a second violation of the same standard.

In addition, *Bunge*'s rejection of *Potlatch* may no longer be good authority as a result of the Supreme Court's decision in *Smiley v. Citibank,* 517 U.S. ——, 116 S.Ct. 1730, 135 L.Ed.2d 25 (1996). In 1976, the Court of Appeals for the Third Circuit in *Bethlehem Steel Corp. v. O.S. & H.R. Com'n,* 540 F.2d 157, 162 (3d Cir.1976), adopted a definition of a "repeated" violation that differed from the *Potlatch* definition. Following the Supreme Court's decision in *Smiley v. Citibank, supra,* the Third Circuit repudiated its prior decision and adopted the *Potlatch* definition. In *Reich, supra,* the Third Circuit Court of Appeals explained why it was no longer following its decision in *Bethlehem Steel* and instead was following *Potlatch* stating:

> "Recently, the Supreme Court reemphasized that courts must defer to an agency's interpretation of statutes that the agency is charged with administering, explaining why such a high degree of deference is owed:
>
> > 'It is our practice to defer to the reasonable judgments of agencies with regard to the meaning of ambiguous terms in statutes they are charged with administering.... We accord deference to agencies ... not because of a pre-

sumption they drafted the provisions in question, or were present at the hearings, or spoke to the principal sponsors; but rather because of a presumption that Congress, when it left ambiguity in a statute meant for implementation by an agency, understood that the ambiguity would be resolved, first and foremost, by the agency, and desired the agency (rather than the courts) to possess whatever degree of discretion the ambiguity allows.... [T]he whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'

*Smiley v. Citibank (South Dakota), N.A.,* — U.S. —, — – —, 116 S.Ct. 1730, 1733–34, 135 L.Ed.2d 25 (1996)."

*Reich,* 90 F.3d at 859–60. It is conceivable that the Fifth Circuit Court of Appeals may reexamine its prior decision, which differs from *Potlatch,* in the same manner that the Third Circuit reexamined its prior decision that differed from *Potlatch.*

The final reason why *Bunge* should be rejected in Maryland is that, less than three weeks after the Court of Special Appeals handed down its opinion in the instant case, this Court rejected the foundation for the *Bunge* holding in *Bethlehem Steel Corp. v. Comm. of Labor,* 339 Md. 323, 662 A.2d 256 (1995) (hereinafter *Bethlehem I* ). The foundation for the *Bunge* opinion is its view that "[a]bsent a different allocation of the burden of persuasion by the substantive statute, both the burden of production and persuasion remain with the Secretary." *Bunge,* 638 F.2d at 838. This is not the law in Maryland. In *Bethlehem I,* an analogous, if not controlling, case involving the same employer, Bethlehem Steel Corp., this Court expressly sanctioned shifting the burden of production and persuasion from the Secretary to the employer by, in effect, implying a prima facie case.

In *Bethlehem I,* the issue was similar, if not identical, to the issue in the instant case; we held that when an employer is charged with a violation of a MOSHA specific duty safety standard that contains a method by which work hazards could

be abated, the burden of proof could be shifted from the Commissioner to the employer to prove the impossibility or infeasibility of compliance with the standard's abatement method. We made it clear that the issue was whether the burden of production could be shifted to the employer, and we stated:

> "The issue is whether, under a citation charging violation of the machine guarding requirements of 29 C.F.R. § 1910.212(a)(1), the burden is on the employer to prove infeasibility of compliance as an affirmative defense."

*Bethlehem I,* 339 Md. at 325, 662 A.2d at 257. In determining that the burden of persuasion and production could be shifted to the employer, we followed the federal administrative practice, stating:

> "MOSHA and the federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. §§ 651 through 678, are substantially similar. When interpreting federal regulations enforced under MOSHA, we look to federal cases for guidance. *J.I. Hass Co. v. Department of Licensing & Regulation,* 275 Md. 321, 330, 340 A.2d 255, 260 (1975)." (Footnote omitted).

*Bethlehem I,* 339 Md. at 328, 662 A.2d at 258.

Our holding in *Bethlehem I* should be our holding in the instant case. In *Bethlehem I,* our specific holding was: "Applying the weight of authority under the federal precedents, we hold that the Commissioner correctly placed on Bethlehem the burden of proof that is in dispute." 339 Md. at 340–41, 662 A.2d at 264.

Finally, and perhaps most significantly, when an employer has previously been adjudicated guilty of violating a safety standard and is subsequently adjudicated guilty of violating the same safety standard, it makes sense to say that the second violation is at least prima facie evidence of a repeated violation and the burden ought to be on the employer to show, as an affirmative defense, why the second violation should not be found to be a repeated violation. Twice before Bethlehem was adjudicated in violation of the same safety standard for

failure to correct *recognized* hazards in electrical equipment that were capable of electrocuting its employees. When again Bethlehem Steel failed to correct a *recognized* hazard in a piece of electrical equipment that in fact electrocuted an employee, it is appropriate to conclude that there is at least a prima facie repeated violation, and the burden ought to be on Bethlehem to establish, as an affirmative defense, that its prior and present violations of the same standard are not substantially similar. These standards are designed to protect employees, and the third instance of ignoring equipment with a *recognized* risk of causing death or serious physical injury by electrocution ought to at least establish a prima facie case of a repeated violation. There is no reason to reverse the Commissioner's finding of a repeated violation. I respectfully dissent.

Judges RODOWSKY and RAKER have authorized me to state that they join in the views expressed in this concurring and dissenting opinion.