662 A.2d 256

BETHLEHEM STEEL CORPORATION

v.

COMMISSIONER OF LABOR AND INDUSTRY.

No. 143, Sept. Term, 1994.

Court of Appeals of Maryland.

July 25, 1995.

Eric Hemmendinger (Earle K. Shawe, Shawe & Rosenthal, on brief), Baltimore, for petitioner.

Jonathan R. Krasnoff (J. Joseph Curran, Jr., Attorney General of Maryland, on brief), Baltimore, for respondent.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, KARWACKI, BELL and RAKER, JJ.

RODOWSKY, Judge.

This judicial review action arises under the Maryland Occupational Safety and Health Act (MOSHA), Md.Code (1991 & 1994 Cum.Supp.), §§ 5–101 through 5–901 of the Labor and Employment Article (LE). The issue is whether, under a citation charging violation of the machine guarding requirements of 29 C.F.R. § 1910.212(a)(1), the burden is on the employer to prove infeasibility of compliance as an affirmative defense. The Court of Special Appeals, in an unreported opinion, held that the burden was on the employer. Because, as reviewed *infra*, the great weight of federal authority confirms the intermediate appellate court's analysis, we shall affirm.

On August 21, 1991, an employee of Bethlehem Steel Corp. (Bethlehem) was fatally injured while working on a lathe in the tin mill machine shop at the Sparrows Point plant. The employee was polishing a Halogen line plater contact roll. These rolls are used as part of a conveyor line in order to roll steel plates through a chemical solution. Contact with the chemical solution causes deposits on the rolls which must be removed via a polishing operation. The polishing is performed on a Lodge & Shipley lathe by using a strip of emery cloth which an operator loops around the roll allowing the rotation of the lathe to polish the roll. The strip of emery cloth is held at both ends by the operator, and the operator's hands come in close proximity to the lathe's chuck jaws.[1]

---

1. The Lodge & Shipley lathe is a large industrial lathe. When the operator faces the lathe its control mechanisms are located to the operator's left. The "work" (a piece being lathed) is held in the lathe on the right side by an end stock. The chuck and chuck jaws hold the work on the left side. The chuck is connected to the motor of the lathe and rotates accordingly. The chuck is circular, twenty-four inches in diameter and approximately five inches thick. There are four chuck jaws that are contained in equally spaced slots which radiate from the center of the chuck. Shims, normally made of copper, are placed between the work and the jaws to protect the work. The jaws position and hold the work in the exact center of the chuck allowing the work to rotate with the chuck. The jaws and shims extend approximately three inches from the face of the chuck.

The accident occurred when the operator's glove became entangled in a keyway of the roll being polished.[2] The roll was rotating at 344 rpm, and the operator was pulled down under the roll, struck his head, and suffered fatal injuries. An inspector from the Commissioner of Labor and Industry's occupational safety and health staff (MOSH) investigated. No violation was charged concerning the immediate cause of death.

During the investigation the inspector observed the alleged violation involved in this case. The inspector issued a citation citing 29 C.F.R. § 1910.212(a)(1) and charging specifically that "[m]achine guarding was not provided to protect operators and other employees from hazards created by rotating parts of lathe chuck jaws and shims." [3]

Bethlehem contested the citation, and the hearing examiner affirmed. The examiner found, *inter alia*, that it was feasible to provide guarding and that it did not present a greater hazard to the operator during polishing than did unguarded chuck jaws.

On review before the Commissioner, Bethlehem argued that MOSH had not proved that guarding the chuck was feasible. The employer's position was that workers would have to place their hands under the guard in order to perform the polishing operation, so that employee safety would not be improved by any guarding mechanism. Lathe chuck guards are commercially available, and they are affixed to lathes at Bethlehem that are used for other functions. Chuck guards shield the worker from flying chips of solid material and from the splatter of liquids, but, Bethlehem submits, they do not abate

---

2. Wearing gloves while working on a lathe is a violation of Bethlehem's safety code. MOSH readily acknowledged that Bethlehem thoroughly trained its workers not to do so. In fact, the fatally injured operator had received a safety training update on the morning of his death.

3. This federal standard is in effect in Maryland. Maryland operates a federally approved State Occupational Safety and Health Plan, 29 U.S.C. § 667, and the Commissioner of Labor and Industry has adopted the federal safety standards for enforcement in Maryland. Maryland Regs.Code (COMAR) tit. 09, § 12.31.A.

the hazard in polishing. The Commissioner held that the "employer has the burden of proving as an affirmative defense that it is impossible to guard the machine in any fashion and that there are no alternate means for protecting employees." On that analysis, and because Bethlehem did not contend that it had established impossibility, the Commissioner upheld the citation of violation.

Bethlehem sought judicial review of the Commissioner's decision in the Circuit Court for Baltimore County. The allocation of the burden of proof concerning feasibility was the only question addressed by the circuit court. It reversed the Commissioner.

The Commissioner appealed to the Court of Special Appeals which reversed the circuit court. The intermediate appellate court agreed that the burden was on the employer under the standard in question, but held that the Commissioner had misstated that burden. Rather than proving that abatement was "impossible," the Court of Special Appeals held that the burden was one of "feasibility." Accordingly, the matter was remanded back to the Commissioner.

On Bethlehem's petition this Court issued the writ of certiorari in order to determine the allocation between the parties of the burden concerning feasibility of compliance to abate an alleged violation of 29 C.F.R. § 1910.212(a)(1).[4] There was no cross petition by the Commissioner, and no party before this Court treats the impossibility/infeasibility issue as embraced within the petition that we granted.[5]

---

**4.** Hereafter, in citing to the federal Occupational and Health Safety Standards, we shall omit the citation to Title 29 of the Code of Federal Regulation and to Part 1910. For example, the standard in the violation charged in this case becomes § 212(a)(1).

**5.** At what point in the history of the federal standards, and by whom, the concept was expressed as "impossibility" or "infeasibility" is a separate study in itself. *See* Seibel Modern Mfg. & Welding Corp., 1991–93 OSHD (CCH) ¶ 29,442 at 39,682–683 (R.C.1991). The required extent of the showing, by whomsoever has the burden, is not an issue that is before us in this case. Consequently, we shall use at times

I

■ MOSHA and the federal Occupational Safety and Health Act of 1970 (OSHA), 29 U.S.C. §§ 651 through 678, are substantially similar.[6] When interpreting federal regulations enforced under MOSHA, we look to federal cases for guidance. *J.I. Hass Co. v. Department of Licensing & Regulation,* 275 Md. 321, 330, 340 A.2d 255, 260 (1975).

■ Both acts create two kinds of obligations, one under the "general duty clause,"[7] and the other under the "specific duty clause."[8] It is well settled that, when undertaking to establish a violation of the general duty clause, the Commissioner has the burden of proving feasibility of compliance.

"[T]he Secretary must be constrained to specify the particular steps a cited employer should have taken to avoid

---

the alternative, "impossibility/infeasibility," even when a precedent under discussion speaks only of "impossibility."

6. The legislative history of the development and relationship of these two acts is detailed in *J.I. Hass Co. v. Department of Licensing & Regulation,* 275 Md. 321, 324–28, 340 A.2d 255, 257–59 (1975).

7. The general duty clause of OSHA, 29 U.S.C. § 654(a)(1), requires that each employer
   "shall furnish to each of his employees employment and a place of employment which are free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees."
   The general duty clause of MOSHA, LE § 5–104(a), requires that each employer
   "shall provide each employee of the employer with employment and a place of employment that are:
   (1) safe and healthful; and
   (2) free from each recognized hazard that is causing or likely to cause death or serious physical harm to the employee."

8. OSHA's specific duty clause, 29 U.S.C. § 654(a)(2), provides that each employer "shall comply with occupational safety and health standards promulgated under this chapter."
   MOSHA's specific duty clause, LE § 5–104(b)(1), provides that "[e]ach employer shall comply with this title, each applicable regulation that the Commissioner adopts to carry out this title, and each applicable order that the Commissioner passes under this title."

citation, and to demonstrate the feasibility and likely utility of those measures."

*National Realty & Constr. Co. v. OSHRC,* 489 F.2d 1257, 1268 (D.C.Cir.1973); *see also Faultless Div., Bliss & Laughlin Indus., Inc. v. Secretary of Labor,* 674 F.2d 1177, 1189 (7th Cir.1982); *Ace Sheeting & Repair Co. v. OSHRC,* 555 F.2d 439, 441 (5th Cir.1977); *United Steelworkers of Am. AFL–CIO, Local 2610 v. Bethlehem Steel Corp.,* 298 Md. 665, 680, 472 A.2d 62, 70 (1984). The rule of these cases is driven by the concern that, absent fair notice of what is required or prohibited, there may be a violation of due process.

■ Similarly, in cases where a citation charges violation of the specific duty clause by citing to a regulatory standard, the same concern has been manifested. Thus, in a case involving a standard other than § 212, the court said that "where only a general standard is involved without suggested or specified means of compliance, the burden is placed upon the Secretary to establish a technological and feasible means of compliance." *Quality Stamping Prods. v. OSHRC,* 709 F.2d 1093, 1099 (6th Cir.1983); *see also Modern Drop Forge Co. v. Secretary of Labor,* 683 F.2d 1105, 1113 (7th Cir.1982). On the other hand,

"where a specific duty standard contains the method by which the work hazard is to be abated, the burden of proof is on the employer to demonstrate that the remedy contained in the regulation is infeasible under the particular circumstances."

*Ace Sheeting & Repair,* 555 F.2d at 441.

For burden of proof allocation purposes those standards that are treated in the same way as the general duty clause are referred to, in abbreviated fashion, as general standards. Conversely, for burden of proof allocation purposes, those standards that are not treated in the same way as the general duty clause are referred to as specific standards.

■ In the instant case, the issue then can be said to be whether, in the burden of proof context, § 212(a)(1) is general or specific. The entire standard, in relevant part, reads as follows:

"**§ 1910.212  General requirements for all machines.**

"(a) *Machine guarding*—(1) *Types of guarding.* One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks.  Examples of guarding methods are—barrier guards, two-hand tripping devices, electronic safety devices, etc.

"(2) *General requirements for machine guards.*  Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible.  The guard shall be such that it does not offer an accident hazard in itself.

"(3) *Point of operation guarding.*  (i) Point of operation is the area on a machine where work is actually performed upon the material being processed.

"(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded.  The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

. . . .

"(iv) The following are some of the machines which usually require point of operation guarding:

. . . .

"(*d*) Power presses.

. . . .

"(4) *Barrels, containers, and drums* . . . .

"(5) *Exposure of blades* . . . .

"(b) *Anchoring fixed machinery* . . . ."

## II

Both parties before this Court claim support for their positions in federal precedents. These include not only decisions of United States Courts of Appeal, but also of the Occupational Safety and Health Review Commission, an independent, quasi-judicial agency established by OSHA (the Review Commission or Commission). Bethlehem principally relies on *Diebold, Inc. v. Marshall*, 585 F.2d 1327 (6th Cir.1978). Review Commission and judicial decisions dealing with § 212 reveal that *Diebold* is out of the mainstream of federal precedent, to the extent, if any, that it holds that the burden concerning feasibility of compliance with §§ 212(a)(1), 212(a)(3)(ii), or 212 as a whole, is on the U.S. Secretary of Labor (the Secretary).

OSHA was enacted by the Act of December 29, 1970, Pub.L. No. 91–596, 84 Stat. 1590. As early as 1975 the Review Commission had held that § 212(a)(1) was not "unenforceably vague if interpreted to require point of operation guards." *Paccar, Inc.*, 1974–75 OSHD (CCH) ¶ 19,595 at 23,404 (R.C. 1975).

*Paccar* involved a press brake, a type of power press. A press brake is used to shape metal by the action of two dies against each other. The material to be shaped is placed upon the lower die, the operator causes the upper die to descend, and the machine applies great pressure to the metal at the point of operation between the two dies. The operation is hazardous, particularly when the metal is manually inserted and aligned.

The Review Commission reasoned in *Paccar* that because "[t]he standard [§ 212(a)(1) ] specifically mentions point of operation guarding as one of the methods of guarding to be employed," and because § 212(a)(3)(iv) specified power presses, "the standard explicitly requires point of operation guards on the types of machines" involved. *Id.* at 23,404–405.

That same year, in *Buckeye Indus., Inc.*, 1975–76 OSHD (CCH) ¶ 20,239 (R.C.1975), an employer was cited for a § 212(a)(3)(ii) violation due to the complete absence of point of

operation guards on sewing machines. The Review Commission held that the Secretary "need not show that it is possible for guards to be placed upon the machines; the burden of showing impossibility is properly placed on the employer...." *Id.* at 24,120. The Review Commission said that the § 212(a)(3)(ii) "standard itself prescribes the performance required by guarding." *Id.* The Commission further said that the standard "also suggests several guarding methods such as barrier guards, two hand-tripping [sic] devices and electronic safety devices," but to support that statement the Commission cited to § 212(a)(1) and not to the text of § 212(a)(3)(ii). *Id.*

The Fifth Circuit affirmed. *Buckeye Indus., Inc. v. Secretary of Labor,* 587 F.2d 231 (5th Cir.1979). That court said that "[t]he contentions as to the vagueness of the regulations and the allocation of the burden of proof under the regulations are clearly without merit." *Id.* at 236 (footnotes omitted).

The holding of *Buckeye Indus., i.e.,* that it was not the Secretary's burden to prove the existence of an appropriate means of abatement, was applied as direct precedent in *Hood Sailmakers, Inc.,* 1977–78 OSHD (CCH) ¶ 22,422 at 27,038–039 (R.C.1977). Significantly, the citation in *Hood Sailmakers* charged violation of § 212(a)(1).

A case emphasized by the respondent before this Court is *A.E. Burgess Leather Co. v. OSHRC,* 576 F.2d 948 (1st Cir.1978). The hazard involved cutting out leather to pattern by the use of " 'beam dinkers,' a kind of press which drives a hand held die down into a piece of leather positioned on a block." *Id.* at 949. Burgess Leather had been cited under § 212(a)(1). *A.E. Burgess Leather Co.,* 1977–78 OSHD (CCH) ¶ 21,573 at 25,885 (R.C.1977). The administrative law judge had placed the burden of proving impossibility/infeasibility on the Secretary, but the Review Commission reversed by applying *Buckeye Indus. Id.* at 25,886.

Before the First Circuit, Burgess Leather argued infeasibility. The court held that

" 'where a specific duty standard contains the method by which the work hazard is to be abated, the burden of proof

is on the employer to demonstrate that the remedy contained in the regulation is infeasible under the particular circumstances.'"

576 F.2d at 952 (quoting *Ace Sheeting & Repair,* 555 F.2d at 441). The Secretary's evidence had indicated that the die could be held in place by a flexible arm, thus freeing both of the operator's hands for triggering the dinker by a two-hand control, a guard specifically mentioned in § 212(a)(1).[9] The *Burgess Leather* court held that the employer had not rebutted that testimony and thus had failed to meet its burden of proof under § 212(a)(1). *Id.* at 952.

Against the foregoing background *Diebold* was decided. Bethlehem asserts that *Diebold* "held that § 1910.212(a)(1) is a general standard, under which the agency has the burden of proof with respect to feasibility of abatement." Brief of Petitioner at 12. As we read *Diebold,* it does not make so definitive a holding.

An enforcement officer had cited Diebold under § 212(a)(3)(ii) for the absence of guards on the point of operation of press brakes and mechanical punch presses. *Diebold, Inc.,* 1975–76 OSHD § 20,333 at 24,248 (R.C.1976). There is no indication that the employer argued a burden of proof issue before the Commission. It upheld the citation. Before the Sixth Circuit Diebold prevailed on a due process argument based on "the insufficiency of the warning," a holding based on the particular facts in that case. *Diebold,* 585 F.2d at 1338. The court recognized that its holding would not produce the same result in future cases because "[o]nce such a construction has been provided, wholly prospective application of the rule thus established does not offend due process since the interpretive decision itself provides the requisite warning." *Id.*

---

9. In the case before us we do not understand Bethlehem to argue that the types of commercially available lathe chuck guards described in the testimony on behalf of the Maryland Commissioner are not "barrier guards" as that term is used in § 212(a)(1).

Relevant to the case before us, however, is part of the reasoning of the Sixth Circuit in deciding an argument on which Diebold did not prevail. The source of § 212 under OSHA was a regulation promulgated under the Walsh–Healey Public Contracts Act, 41 U.S.C. §§ 35 through 45. Diebold contended that industrial practice and belief during the operative period of the predecessor regulation contradicted the applicability of § 212 to press brakes. 585 F.2d at 1331. The Sixth Circuit rejected that argument. *Id.* at 1332. Diebold then argued that press brake guarding was impossible in 1971 when the Secretary promulgated the former regulation as an OSHA regulation. *Id.* at 1333. In this connection the court interpreted § 212, apparently in its entirety, as applying "only where there exists an identifiable and practical means for guarding the specific machine in the specific uses to which the cited employer puts it." *Id.*

The *Diebold* court then gave three reasons for this construction. First, the construction placed "an eminently reasonable limitation on the breadth to which the standard's literal language might otherwise be extended." *Id.* Secondly, it comported "with the principle that where a standard imposes a duty without specifying the means of compliance, the Secretary has the burden of establishing the existence of a specific and technologically feasible means of compliance as an element of his showing that a violation has occurred." *Id.* Third, the court said that

"most importantly, we believe that this construction embodies a reasonable assessment of the intended nature of § 1910.212 (and its Walsh–Healey source) as a general 'catch-all' or 'gap-filler' intended to impose a point of operation guarding requirement in any case where a hazard exists and guarding is feasible but no other regulation addresses the problem."

*Id.*

From the standpoint of the issue before us, it is noteworthy that *Diebold* did not apply to the facts of that case its statement in the second reason concerning the burden of

feasibility. Also noteworthy is that, following three citations given in support of the second reason, the court inserted a footnote which states: "Of course, where the regulation itself specifies the means for compliance, the burden rests on the employer to show the technological impossibility of the specified means. *See, e.g., A.E. Burgess Leather Co. v. OSHRC,* 576 F.2d 948, 952 (1st Cir.1978). . . ." *Id.* at 1333 n. 8.

Diebold's argument that press brake guarding was impossible in 1971, and the court's answering construction of § 212, requiring identifiable and practical means for guarding, treat as completely compatible the court's second reason in the body of the opinion and the footnote. The court considered technological feasibility an issue on which the burden may fall on the Secretary or on the employer depending upon whether the standard involved "specifies the means for compliance." *Id.* n. 8. Read in that fashion, reason two is not a statement directed exclusively at § 212, or at any subsection thereof, but it is simply a statement of the compatibility of the construction of § 212 with general OSHA law. Otherwise, the court's second reason would contradict footnote eight, which the court obviously considered consistent with reason two. Finally, if reason two were read as a ruling concerning the burden of proof on the § 212(a)(3)(ii) violation citation before the court, *Diebold* would not, in any event, be authority addressing the burden under § 212(a)(1), because the favorable citation in footnote eight to *Burgess Leather* indicates that a different burden of proof applies to cases under § 212(a)(1).

The third of the above-quoted reasons given by *Diebold* is a description of the breadth or scope of the applicability of § 212. The standard can be labeled, "general," because it applies to all machinery that exposes the operator to hazard. Generality in that sense does not fix the feasibility burden. Even under the language of *Diebold,* the test for the burden of feasibility would be whether the standard "specifies" the compliance.

In any event, we find certain federal precedent, decided subsequent to *Diebold,* persuasive that § 212(a)(1) is a stan-

dard as to which the employer has the burden of proving impossibility/infeasibility.

The Review Commission clearly has not read and applied *Diebold* in the fashion in which Bethlehem reads it. Shortly prior to the decision in *Diebold,* the Commission had decided *Hughes Bros., Inc.,* 1978 OSHD (CCH) ¶ 22,909 (R.C.1978). The citation charged a violation of § 212(a)(3)(ii) for an insufficiently guarded point of operation on a press brake. The employer argued that, under *Paccar,* 1974–75 OSHD (CCH) ¶ 19,595, partial guarding was sufficient and, in any event, the burden of proving feasibility was on the Secretary. The Commission held that partial protection did not comply with § 212(a)(3)(ii), and, inasmuch as § 212 should be construed as a whole, the Commission overruled *Paccar*'s holding that partial protection satisfied § 212(a)(1). *Hughes Bros.,* 1978 OSHD (CCH) at 27,717. Then, relying on *Buckeye Indus.,* 1975–76 OSHD (CCH) ¶ 20,239, the Commission reaffirmed that "the burden of proving impossibility of compliance must be borne by the employer as an affirmative defense." *Hughes Bros.,* 1978 OSHD (CCH) at 27,719. Nothing in *Hughes Bros.* specifically limited its burden of proof holding to cases under subsection (a)(3)(ii) of § 212.

After *Diebold* was decided, the Commission decided *Consolidated Aluminum Corp.,* 1981 OSHD (CCH) ¶ 25,069 (R.C. 1980). The employer (CONALCO) was cited for violating § 212(a)(1). The hazard was that an employee might be caught in an ingoing nip point when the product, sheet aluminum which had been cut into strips of a desired width, was rewound on a mandrel or spindle. An administrative law judge held that CONALCO did not meet its burden of proving that guarding was infeasible. *Id.* at 30,970. Before the Commission, CONALCO argued, *inter alia,* that the Secretary had the burden "because the cited standard, section 1910.212(a)(1), does not specify a particular method of abating the hazard." *Id.* at 30,971.

The Review Commission, after citing *Burgess Leather,* but not *Diebold,* rejected CONALCO's contention with the following analysis:

"CONALCO asserts, however, that section 1910.212(a)(1) should be analogized to section 5(a)(1) of the Act because section 1910.212(a)(1) is written in broad terms and that cases defining the Secretary's burden under section 5(a)(1) should therefore be applied in this context. In *Hughes Brothers,* the Commission rejected a similar attempt to analogize the point of operation machine guarding standard, 29 C.F.R. § 1910.212(a)(3)(ii), with section 5(a)(1) of the Act. The Commission concluded that section 1910.212(a)(3)(ii) states the hazard to be protected against and the performance required with sufficient clarity that the vagueness concerns underlying the allocation of burdens under section 5(a)(1) are not present. In *Hughes Brothers,* the Commission also stated that section 1910.212 should be read as a whole and that its sections, including specifically their performance criteria, are to be considered *in pari materia.* We conclude that section 1910.212(a)(1), like section 1910.212(a)(3)(ii), states the hazards to be protected against and the performance required with sufficient clarity, particularly when read in the context of section 1910.212 as a whole, to render application of a section 5(a)(1) analysis inappropriate. Accordingly, extending the holding and reasoning of *Hughes Brothers,* we reject CONALCO's contention that section 1910.212(a)(1) should be analogized to section 5(a)(1) of the Act."

*Id.* at 30,976 (citations omitted).

Two years later the Review Commission decided a case in which the employer, a structural steel fabricator, was cited under § 212(a)(1) as to certain machinery and under § 212(a)(3)(ii) as to other machinery. *George C. Christopher & Son, Inc.,* 1982 OSHD (CCH) ¶ 25,956 at 32,525 (R.C.1982). Speaking about both phases of the case the Commission said that "[i]n order to establish the affirmative defense of impossibility of compliance, an employer must demonstrate that (1) compliance with the standard would preclude performance of required work and (2) alternative means of protection are unavailable." *Id.* at 32,532.

Bethlehem's argument, based on *Diebold*, has not fared substantially better in the United States Courts of Appeal. In 1981 the First Circuit considered a § 212(a)(1) violation. *PBR, Inc. v. Secretary of Labor*, 643 F.2d 890, 893 (1st Cir.1981). Because "PBR has not shown that it took all demonstrably feasible measures to protect its employees," the court held that "PBR failed to demonstrate that it was actually impossible to effectuate compliance with the standard and its defense must fail." *Id.* at 895.

Issues concerning the generality of § 212 were addressed in depth in *Faultless Div., Bliss & Laughlin Indus., Inc. v. Secretary of Labor*, 674 F.2d 1177 (7th Cir.1982). Faultless was cited for violation of § 212(a)(3)(ii). *Id.* at 1180. The employer argued that the standard violated due process for failure to give a sufficient and fair warning of what constituted the violation. The court, however, held that the standard stated "that the point of operation of a machine 'shall be guarded'" and that "[t]he methods of compliance are illustrated, in 29 C.F.R. § 1910.212(a)(1) (1980), by several nonexhaustive examples of point of operation guarding." *Id.* at 1186. Faultless argued that because the regulation was "'very general,' 'unclear,' or a 'performance standard'" its construction should be governed by industry practice. *Id.* The court, however, said that the standard was "*a clearly applicable, unarguable and specific regulation on the subject in question.*" *Id.* The standard was "sufficiently specific as to the machines affected and as to the methods of compliance to reasonably apprise Faultless in clear terms that its presses must be guarded," because, *inter alia*, the regulation "even provide[d] several examples of guarding devices." *Id.* at 1187.

Faultless's final argument was that the Secretary must demonstrate feasibility. The court, however, held that, absent a directive in the regulation itself, "the Secretary must demonstrate the feasibility of a compliance order issued under a regulation that does not, on its face, expressly provide for any particular means of compliance." *Id.* at 1189. The court held that "the machine-guarding regulation does specify several ways for an employer to comply with its standards. Three

specific guarding techniques—'barrier guards, two-hand trip-ping devices[, and] electronic safety devices' are set out in the regulation. 29 C.F.R. § 1910.212(a)(1) (1980)." *Id.* The court cited, *inter alia, Burgess Leather* and *PBR, Inc.,* both *supra.* Although *Diebold* is cited as to other issues in the opinion, it is not cited on the burden of proof point.

The Sixth Circuit had occasion to return to the feasibility burden issue in *Quality Stamping Prods. v. OSHRC,* 709 F.2d 1093 (6th Cir.1983). The citation issued to the employer specified § 217(c)(1)(i), a standard applicable to "normal power press operating modes." *Id.* at 1097. Relying on *Diebold,* the employer argued that "the Secretary has the burden of speci-fying 'technologically feasible means of compliance.'" *Id.* at 1099 (quoting *Diebold,* 585 F.2d at 1333). The court respond-ed that "[t]hat burden, however, is imposed only where the standard in question 'imposes a duty without specifying the means of compliance.'" *Id.* (quoting *Diebold,* 585 F.2d at 1333). Section 217, in the court's view, included "a specifica-tion of acceptable means for achieving the end of safeguarding the point of operation of a power press." *Id.* at 1098–99. Consequently, the burden was on Quality Stamping, and it was a burden that Quality Stamping did not meet. *Id.* at 1099.

From the standpoint of the case before us, there may be significance in the Sixth Circuit's restatement of its rule. The court said:

> "We make clear, however, that where only a general stan-dard is involved without *suggested* or specified means of compliance, the burden is placed upon the Secretary to establish a technological and feasible means of compliance."

*Id.* (emphasis added). Under that articulation of a rule, the Secretary does not bear the burden if it is determined that the standard is "general." The burden does not fall on the Secretary unless, in addition, the general standard is without means of compliance, and those means of compliance may be either "suggested or specified." Under that test, § 212(a)(1), even if it is "general," at least *suggests,* by illustration, means of compliance.

The rule of *Diebold* and *Quality Stamping*, as currently applied in the Sixth Circuit, is clouded by an opinion that is not reported in the Federal Reporter, *Secretary of Labor v. Miami Indus., Inc.*, 15 OSHC (BNA) 2025 (6th Cir.1992). The citation was under § 212(a)(1). It charged as a violation the measures taken in abatement of a previous § 212(a)(1) violation that the employer had worked out with the assistance of OSHA officials. *Miami Indus.* holds that, under those circumstances, the employer was deprived of fair notice. Although *Miami Indus.* makes no holding on the burden of proof, the opinion recites: "This particular regulation does not proscribe [sic] the precise means of compliance. We had held that when the regulation does not specify the means of compliance then the Secretary has the burden to prove the feasibility of compliance." *Id.* at 2027.

Bethlehem also cites *Quality Stamping Prods.*, 709 F.2d at 1099, *Josephs v. Harris Corp.*, 677 F.2d 985, 990 (3d Cir.1982), *Irvington Moore, Div. of U.S. Natural Resources, Inc. v. OSHRC*, 556 F.2d 431, 436 (9th Cir.1977), *Long Mfg. Co., N.C., Inc. v. OSHRC*, 554 F.2d 903, 905 (8th Cir.1977), and *Hamilton Die Cast, Inc.*, 1984–85 OSHD (CCH) ¶ 26,983 at 34,689 (R.C.1984), for their references to § 212(a)(1) as a general standard. None of these decisions, however, addresses the burden of proof issue. The § 212(a)(1) references relate to the applicability or scope of the standard to all machines. Generality in that sense does not control the burden of proof of infeasibility.

Here the cited standard, § 212(a)(1), requires machine guarding "to protect the operator and other employees in the machine area from hazards." Examples of the hazards embraced by the standard include "those created by ... rotating parts." "Examples of guarding methods" are set forth, including barrier guards. Thus, the standard "contains," *Burgess Leather*, 576 F.2d at 952, "suggest[s]," *Quality Stamping*, 709 F.2d at 1099, and, indeed, "does specify several ways for an employer to comply with its standards," *Faultless*, 674 F.2d at 1189. Applying the weight of authority under the federal precedents, we hold that the Commissioner correctly placed on

Bethlehem the burden of proof that is in dispute. Under the mandate of the Court of Special Appeals, Bethlehem will have the opportunity to argue to the Commissioner that, and to obtain an agency ruling on whether, Bethlehem satisfied its burden of proof of infeasibility.

*JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY THE PETITION-ER, BETHLEHEM STEEL CORPORATION.*