*Commissioner of Labor and Industry v. The Whiting-Turner Contracting Company*, No. 30, September Term 2018.  Opinion by Hotten, J.

**LABOR AND EMPLOYMENT – RECOGNIZED HAZARDS – SUBSTANTIAL EVIDENCE** – The Court of Appeals held that there was substantial evidence before the Commissioner of Labor and Employment to conclude that the Whiting-Turner Contracting Company's failure to install gooser braces and use of an undersized spacer beam during construction constituted recognized hazards in violation of Maryland Code, Labor and Employment Article, § 5-104(a).

Circuit Court for Baltimore County
Case No. 03-C-16-005006
Argued: November 29, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 30

September Term, 2018

_____

COMMISSIONER OF LABOR AND
INDUSTRY

v.

THE WHITING-TURNER
CONTRACTING COMPANY

_____

Barbera, C.J.,
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D.,
(Senior Judge, Specially Assigned)

JJ.

_____

Opinion by Hotten, J.
Watts, J., joins in judgment only.
Getty and Adkins, JJ., dissent.

_____

Filed: January 23, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

Petitioner, the Commissioner of Labor and Industry (the "Commissioner"), seeks review of a decision by the Court of Special Appeals, which reversed the Commissioner's determination that Respondent, the Whiting-Turner Contracting Company ("Whiting-Turner") violated Maryland Code, Labor and Employment Article, § 5-104(a), the General Duty Clause, by failing to "furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious physical harm to employees[.]" On appeal, the Commissioner asks this Court to consider the following questions:

1. Did Petitioner correctly determine that Respondent's failure to follow the shoring-tower manufacturer's instructions to use gooser braces in assembling a shoring tower supporting a concrete slab, which resulted in serious injury and death, constituted a recognized hazard within the meaning of § 5-104(a) of the Labor & Employment Article [(Lab. & Empl.)]?

2. Did Petitioner correctly determine that Respondent's use of an undersized spacer beam in the upper support system of a shoring tower constituted a recognized hazard within the meaning of [Lab. & Empl.] § 5-104(a)?

For the reasons articulated below, we answer both questions in the affirmative and shall reverse the judgment of the Court of Special Appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

*The Incident and Investigation*

On May 23, 2013, Whiting-Turner was involved in a construction project to increase the size of the parking garage at the Westfield Montgomery Mall in Bethesda, Maryland. Part of this construction involved removing and relocating portions of the parking deck,

known as double-tees,[1] in order to make room for a crane tower that would be used to construct new floors on top of the existing garage structure. Because Whiting-Turner intended on reusing the double-tees, a Whiting-Turner engineer developed a system whereby workers would raise the double-tees using a hydraulic jack.[2] In order for the process to be conducted safely, the engineer required the placement of four shoring/safety towers,[3] one under each corner of the double-tee. As the hydraulic jack lifted the double-

---

[1] Each double-tee involved in this construction project weighed approximately 42,800 pounds and was made out of pre-stressed concrete. Pre-stressed concrete is concrete that contains steel cables or rods that are placed inside of the concrete once it is poured in order to reinforce it.



[2] A hydraulic jack is a mechanism that uses force to lift the heavy load on top of it.

[3] Shoring towers generally consist of metal frames stacked on top of one another, similar to scaffolding.

tee in small increments, the workers would adjust the shoring/safety towers using the screw jacks[4] to follow the height that the double-tee had been raised to. Once the double-tees were lifted to a certain height, rail assemblies were to be installed beneath it so that the double-tee could slide onto the adjacent parking deck. This created an opening in the parking deck for the crane tower while still preserving the double-tees for future use.

Whiting-Turner assembled the shoring towers using materials from Safway Services, a commercial construction company whom Whiting-Turner had worked with previously. Safway provided Whiting-Turner with a manual for the assembly of the shoring towers. Among their instructions, the assembly manual provided that "[t]he positioning of the gooser braces start when the extension frame is put at a [two foot] or



[4] Screw jacks are small pieces of equipment placed atop each shoring tower that are used to raise or lower the double-tee on top of the towers by small increments, generally fractions of an inch at a time.

3

more extension. As the extension frames are extended, the diagonal gooser braces are connected to the various horizontals of the base frame and the extension frame." Gooser braces are bars that connect the legs of scaffolding and are used to ensure the stability and structural integrity of the scaffolding/shoring tower.[5] Despite the assembly manual's instructions, the gooser braces provided by Safway were never installed or utilized in the construction of the shoring towers.

On May 21, 2013, the construction crew successfully raised and relocated one of the double-tees using the process detailed above. On May 23, 2013, the construction crew began to remove a second double-tee, using the same process. Partially through the removal process on May 23, the workers took a break for lunch. After the workers had returned from lunch and continued raising the double-tee, one of the employees observed that a steel support beam under a steel spacer beam[6] had bent and twisted at the southeast corner of the shoring tower. The site foreman determined that the beam needed to be replaced before proceeding. To replace the support beam, the employees were instructed to jack up the southeast corner of the double-tee in order for the beam to be detached from the shoring tower and replaced. Before the support beam could be replaced, the double-tee and shoring towers collapsed, resulting in the death of one employee and the pinning and severe injury of another.

---

[5] Footnote 3 depicts a scaffolding/shoring tower with a properly installed gooser brace, labeled as a "horizontal diagonal gooser."

[6] The spacer beams were used to shim the shoring tower as it was raised.

The Maryland Occupational Safety and Health Unit ("MOSH"), with assistance from Dr. J. Scott Jin, a civil engineer in the Federal Occupational Safety and Health Administration ("OSHA") initiated an investigation into the accident. Whiting-Turner also employed the services of KCE Structural Engineers, P.C. ("KCE") to determine the cause of the accident and design an "emergency make-safe operation" plan to stabilize the garage. Reports from both Dr. Jin and KCE concluded that Whiting-Turner should have installed gooser braces in the shoring towers and that their failure to do so contributed to the accident. Dr. Jin also concluded that Whiting-Turner's use of an eight-inch high spacer beam between the double-tee stem and the upper beam weakened the stability of the system and rendered the shoring tower unable to support the actual load of the double-tee.

MOSH ultimately issued two citations to Whiting-Turner. First, Whiting-Turner was charged with violating 29 C.F.R. § 1926.305(d)(1)(i),[7] due to their failure to secure the double-tee after it was raised by the hydraulic jack. Second, Whiting-Turner was charged with violating Maryland Code, Lab. & Empl. Article, § 5-104(a), also known as the General Duty Clause,[8] due to their failure to "furnish employment and a place of employment which were free from recognized hazards that were causing or likely to cause death or serious

---

[7] 29 C.F.R. § 1926.305(d)(1)(i) states that "[a]fter a load has been raised, it shall be cribbed, blocked, or otherwise secured at once."

[8] The General Duty Clause provides:
(a) Each employer shall provide each employee of the employer with employment and a place of employment that are:
    (1) safe and healthful; and
    (2) free from each recognized hazard that is causing or likely to cause death or serious physical harm to the employee.

physical harm to employees[.]" MOSH based this second violation on three factors: 1) Whiting-Turner's failure to install gooser braces on the shoring towers; 2) Whiting-Turner's use of an undersized spacer beam, an eight-inch high spacer beam, between the double-tee stem and the upper beam; and 3) the single jacking of the southeast shoring tower.

MOSH assessed Whiting-Turner a total fine of $11,125: $5,325 for violating 29 C.F.R. § 1926.305(d)(1)(i) and $5,800 for violating the General Duty Clause. Whiting-Turner filed a notice of intent to contest the citation and subsequent penalties on December 6, 2013 and the case was referred to the Office of Administrative Hearings on August 7, 2014.

*Procedural History*

An Administrative Law Judge (ALJ) held a three-day hearing in December 2014. The ALJ heard testimony from Dr. Jin, David Latham, a compliance specialist with MOSH, Patrick Bruns, an ironworker employed by Whiting-Turner, and two other employees, both project managers for Whiting-Turner. The ALJ also considered numerous exhibits, including reports from KCE and OSHA, Dr. Jin's written investigation report, and a number of photograph exhibits of the construction site prior to and after the collapse of the towers.

The ALJ issued a proposed decision on March 23, 2015. With regard to violating 29 C.F.R. § 1926.305(d)(1)(i), the ALJ concluded that Whiting-Turner failed "to crib,

6

block, or otherwise secure a load at once after the load was raised[,]" and recommended that the penalty of $5,325 be affirmed. With respect to violating the General Duty Clause, the ALJ noted the following:

- Whiting-Turner claimed that gooser braces were not needed on the shoring tower.

- The extension frames were raised to the level that called for the gooser braces to be used, two feet or higher, and that a failure to use them "created a hazardous condition[.]"

- Whiting-Turner "was on notice from the Safway material that gooser braces should have been used[]" and failure to use them was therefore a recognized hazard.

- Whiting-Turner's use of an undersized spacer beam contributed to the collapse of the double-tee and Whiting-Turner had actual knowledge of the hazard that this posed.

- The single jacking of the southeast corner was a recognized hazard that contributed to the collapse of the double-tee.

- Whiting-Turner could have jacked all of the corners of the double-tee to ensure uniform distribution of weight.

Accordingly, the ALJ recommended that the proposed penalty of $5,800 against Whiting-Turner be affirmed.

Whiting-Turner filed for a review of the ALJ's proposed findings and decision before the Commissioner of Labor and Industry. The Commissioner held a hearing regarding the ALJ's proposed decision on November 18, 2015. On April 14, 2016, the Commissioner issued a Final Decision and Order, affirming the violation and citation under the General Duty Clause, but vacating the violation and citation under 29 C.F.R. § 1926.305(d)(1)(i). The Commissioner concluded that while MOSH failed to prove that the third factor, jacking only the southeast corner of the double-tee, constituted a recognized

7

hazard, the first two factors, the failure to install gooser braces and the use of an undersized spacer beam, were recognized hazards and therefore constituted a violation of the General Duty Clause.

The Commissioner noted that the failure to use gooser braces when the extension frame is extended two feet or higher causes the tower to become "more flexible and less stable[.]" This hazard is "one recognized by the construction industry, specifically the manufacturer . . . [and Whiting-Turner's] employees were familiar with Safway's system and knew that Safway had provided gooser braces . . . ." Because the assembly manual clearly provided installation instructions for the gooser braces, Whiting-Turner "knew or should have known that failure to use the gooser braces was a hazard that was likely to cause death or serious injury to an employee."

With regard to the spacer beam, the Commissioner observed that the spacer beam used was not "sufficiently sized to support the actual load" and that this "weakened the rigidity of the upper support system on top of the shoring towers thereby creating a hazardous condition." Whiting-Turner had previously used "sound engineering practices" in the removal of the double-tees, yet failed to offer any explanation as to why it neglected to employ similarly sound principles in the use of a properly sized spacer beam. Therefore, the use of the eight-inch high spacer beam, which the Commissioner concluded to be undersized, was a recognized hazard.

Whiting-Turner petitioned for judicial review and the Circuit Court for Baltimore County affirmed the Commissioner's decision, concluding that it was legally correct and

8

supported by substantial evidence in the record. On appeal, the Court of Special Appeals reversed the Commissioner's decision on the ground that the decision lacked substantial evidence to support the conclusion that the hazards were "recognized." *Whiting-Turner Contracting Company v. Commissioner of Labor and Industry*, 237 Md. App. 24, 183 A.3d 799 (2018). With regard to the gooser braces, the court noted that the assembly manual gave "merely an explanation of how to set up the shoring system[]" and that there was no "suggestion that the gooser frames were a safety requirement or that the failure to use the gooser braces could cause injury." *Id.* at 57, 183 A.3d at 818-19. Regarding the spacer beams, the court concluded that the testimony from Dr. Jin, concerning sound engineering principles necessitating the use of a different beam, was not enough to establish that Whiting-Turner had actual knowledge of the hazard. *Id.* at 59, 183 A.3d at 820.

## STANDARD OF REVIEW

"We review an administrative agency's decision under the same statutory standards as the [c]ircuit [c]ourt. Therefore, we reevaluate the decision of the agency, not the decision of the lower court." *Gigeous v. E. Corr. Inst*., 363 Md. 481, 495-96, 769 A.2d 912, 921 (2001) (footnote omitted). We, however, "may always determine whether the administrative agency made an error of law. Therefore, ordinarily, the court reviewing a final decision of an administrative agency shall determine (1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision." *Baltimore Lutheran High Sch., v. Employment Sec. Admin*., 302 Md. 649, 662, 490 A.2d 701, 708 (1985). Substantial evidence is defined as "such relevant evidence as a

9

reasonable mind might accept as adequate to support a conclusion[.]" *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978). Additionally, purely legal questions are reviewed *de novo* with considerable "weight [afforded] to an agency's experience in interpretation of a statute that it administers[.]" *Schwartz v. Md. Dep't of Nat. Res.*, 385 Md. 534, 554, 870 A.2d 168, 180 (2005).

## DISCUSSION

The General Duty Clause of the Maryland Occupational Safety and Health Act ("MOSHA"), set forth in § 5-104(a) of the Labor and Employment Article, provides: "Each employer shall provide each employee of the employer with employment and a place of employment that are: (1) safe and healthful; and (2) free from each recognized hazard that is causing or likely to cause death or serious physical harm to the employee." Because MOSHA is modeled after the Federal Occupational Safety and Health Act, Maryland courts frequently turn to Federal decisions for guidance in interpreting MOSHA. *Md. Comm'r of Labor & Indus. v. Cole Roofing Co.*, 368 Md. 459, 470, 796 A.2d 63, 69 (2002); *Bethlehem Steel Corp. v. Comm'r of Labor & Industry*, 339 Md. 323, 328, 662 A.2d 256, 258 (1995).

In order to establish a violation of the General Duty Clause, MOSH must prove: 1) some condition or activity in the workplace presented a hazard; 2) the hazard was "recognized"; 3) the hazard was likely to cause death or serious physical harm; and 4)

10

"feasible means to eliminate or materially reduce the hazard existed."[9] *Sea World of Florida, LLC v. Perez*, 748 F.3d 1202, 1207 (D.C. Cir. 2014) (quoting *Fabi Constr. Co. v. Sec'y of Labor*, 508 F.3d 1077, 1081 (D.C. Cir. 2007)).  A failure to prove at least one of the above elements results in a lack of substantial evidence to support a violation of MOSHA.  "Establishing that a hazard was recognized requires proof that the employer had actual knowledge that the condition was hazardous or proof that the condition is generally known to be hazardous in the industry."  *Kelly Springfield Tire Co. v. Donovan*, 729 F.2d 317, 321 (5th Cir. 1984).  In *Comm'r of Labor & Indus. v. Bethlehem Steel Corp.*, this Court considered whether the presence of a deteriorating toaster oven for use in an employee lunch room, which resulted in the electrocution of an employee, constituted a recognized hazard in violation of 29 C.F.R. § 1910.303(b)(1).  344 Md. 17, 20-21, 684 A.2d 845, 846-47 (1996).  In concluding that such action was a recognized hazard, we explained that "either actual or constructive [knowledge] is the gravamen of employer responsibility under the Act[.]"  *Id.* at 25, 684 A.2d at 849.  This interpretation instructs this Court to conclude that a hazard is "recognized" under Lab. & Empl. § 5-104(a) when the employer has actual or constructive knowledge of the hazard.

---

[9] This appeal does not concern the last two elements of a General Duty Clause violation – that the hazard was likely to cause death or serious physical harm and that feasible means to eliminate or materially reduce the hazard existed, as those issues were not raised on appeal.  Accordingly, our opinion only discusses whether Whiting-Turner's failure to use gooser braces and use of an undersized spacer beam presented hazards, and whether those hazards were "recognized."

11

Because this case focuses on the presence of substantial evidence to support the Commissioner's findings, we conclude that there was substantial evidence to prove that Whiting-Turner's failure to use gooser braces and use of an undersized spacer beam both constitute recognized hazards in violation of the General Duty Clause.

*Whiting-Turner's Failure to Use Gooser Braces Constituted a Recognized Hazard*

The materials for the shoring towers from Safway included a manual with instructions for how to properly assemble the towers. Included in the assembly instructions was the following information:

> The diagonal gooser braces, which attach to the horizontal member of the frames, have spring actuated slides.
>
> ***
>
> The extension frames are individually braced. The positioning of the diagonal gooser braces start when the extension frame is put at a 2' or more extension . . . . As the extension frames are extended, the diagonal gooser braces are connected to various horizontals of the base frame and the extension frame. Illustrated in figure 3 (3' extension), the diagonal gooser braces are attached to the bottom rungs of the base frame and extension frame. The placement of the diagonal gooser braces is simplified because there is only one combination per height adjustment.

It is clear from the assembly manual that gooser braces are called for when the extension frame is extended to two feet or higher. It is also undisputed that the extension frames here were extended to a height greater than two feet at the time of the accident. Therefore, as the above information instructs, the gooser braces should have been installed on the tower.

As the Commissioner properly noted, "[t]he hazard associated with not following Safway's recommendation to utilize the gooser braces when the extension frames were

12

added is that as the shoring tower is extended higher, it becomes more flexible and less stable, creating the potential for the load to shift or fall." In *F & H Coatings, LLC v. Acosta*, the Tenth Circuit considered whether placement of a vessel on pipe racks constituted a recognized hazard. 900 F.3d 1214, 1225 (2018). Concluding that such an action was a recognized hazard, the Tenth Circuit observed that, "[a]t its most basic, the condition involved elevating an incredibly heavy object, placing it on a set of racks, [and] allowing work to be performed on it without securing it against unexpected movement." *Id.* (quotations omitted). Similarly here, the act of raising a 42,800 pound concrete double-tee without installing gooser braces for stability and safety is clearly a hazard to those working underneath and in the proximity of the raised object. Dr. Jin determined that the "[l]ack of the diagonal gooser braces on the extended frames decreased the rigidity of the shoring/skating tower in the north-south direction . . . . Without the diagonal gooser braces, the shoring/skating towers became more flexible and less stable, contributing to the collapse."

However, Whiting-Turner contends that because there were no explicit warnings regarding the danger of failing to use gooser braces when the extension frames have reached a height of two feet or more, there lacked substantial evidence to conclude the presence of a recognized hazard. In *Secretary of Labor v. K.E.R. Enterprises, Inc.*, three employees of an underground utility contractor were injured while performing a pressure test on a pipe that exploded after the employees tightened the bolts in order to repair a small leak without first depressurizing the pipe. 23 BNA OSHC 2241 (No. 08-1225 2013). The

13

Review Commission vacated a citation against K.E.R. that alleged a failure to follow the manufacturer's instructions and industry standards regarding the proper response to a pipe leak. *Id.* at *5. The Review Commission first noted that the conditions did not pose a hazard to the employees, then went on to comment that even if there were a hazard, it was not recognized because the installation instructions did not "contain a safety warning or suggest a link between noncompliance and a safety hazard." *Id.* at *3-4. The instructions were, generally, to "[t]ighten the bolts to the normal range[,]" but did not specify a specific range, tool, or warning for repairing the leak. *Id.* at *4. Additionally, the Review Commission concluded that K.E.R. did in fact comply with both the manufacturer's specifications and the industry standards for dealing with the type of leak observed. *Id.*

Conversely, here Whiting-Turner did not comply with either the manufacturer's instructions or industry standards. The reports and testimony submitted by Dr. Jin, KCE, and MOSH's compliance analyst, Mr. Latham, explained that the installation of gooser braces is required and recommended by the manufacturer of the equipment, Safway, making the hazard known under industry standards. Additionally, the Safway assembly manual clearly provided the material and instructions for installing the gooser braces, providing Whiting-Turner with actual knowledge that they should have been installed. Although the instructions lacked an explicit warning, it was inherently obvious that all of the materials provided by Safway were necessary to build a stable tower. Under these circumstances, substantial evidence existed for the Commissioner to conclude that

14

Whiting-Turner's failure to install gooser braces on the shoring towers constituted a recognized hazard in violation of the General Duty Clause.

*Whiting-Turner's Use of an Undersized Spacer Beam Constituted a Recognized Hazard*

Whiting-Turner's plan to raise and move the double-tees, developed by Whiting-Turner engineers, called for the use of cribbing[10] to support the double-tees while they were being moved. While the plan originally called for lumber cribbing, Whiting-Turner utilized a steel, eight-inch spacer beam instead. Dr. Jin acknowledged in his testimony before the ALJ that using timber would be "preferable as a method of cribbing" because it is a solid piece and prevents the shifting and rotation of the shoring system. Whiting-Turner does not account for the inconsistency in the execution of their plan, an inconsistency that ultimately contributed to the collapse of the shoring tower. According to Dr. Jin, "[t]he placement of the [eight inch] high spacer beam between the double tee stem and the upper W8x10 beam . . . weakened the rigidity of the upper support system on top of the shoring/skating towers in the north-south direction." While the spacer beam used may have been an adequate height to support the load of the normal jacking process in which the weight of the double-tee was equally distributed between all of the shoring towers, that support became tenuous when a single corner was jacked, creating more

---

[10] Cribbing is a technique that is frequently used to secure, stabilize, and support heavy objects during a construction project. It prevents movement and buckling of the steel frames that support heavy objects.

15

pressure on the other towers.[11]  There was therefore substantial evidence before the Commissioner to conclude that the use of an eight-inch spacer beam weakened the rigidity of the shoring system, thereby causing a hazard to the employees involved in the jacking of the double-tee.

Additionally, Dr. Jin's expert opinion, as well as Whiting-Turner's own plan calling for some form of cribbing and support, provides sufficient evidence that the hazard of using an undersized, eight-inch spacer beam was recognized.  Because Whiting-Turner's own engineer developed detailed plans for the jacking and moving of the double-tees, including the use of timber cribbing for support and stability, it is clear to us that Whiting-Turner had actual knowledge of the proper type of cribbing and spacer beams that should be used in a process like the one utilized here.  Sound engineering principles indicate that the weakened nature of the structure "could have been avoided if a bigger beam [were] used or if stiffer plates had been welded to the flanges and web at the loading locations."  This information provided the Commissioner with substantial evidence to conclude that Whiting-Turner's use of an eight-inch high spacer beam constituted a recognized hazard.

## CONCLUSION

We conclude that there was substantial evidence for the Commissioner to determine that Whiting-Turner's failure to install gooser braces and use of an undersized spacer beam

---

[11] The Commissioner concluded in his findings that MOSH failed to prove that this conduct alone, the single jacking of one tower, constituted a recognized hazard and the issue was not raised on appeal.

16

both constituted recognized hazards in violation of the General Duty Clause. A hazard is "recognized" if the employer has actual or constructive knowledge of it. The Commissioner was presented with an assembly manual from Safway providing for the installation of gooser braces on the shoring towers, plans from Whiting-Turner's own engineers calling for the use of proper cribbing and support beams, as well as the expert opinion of Dr. J. Scott Jin and investigation reports from MOSH and KCE Structural Engineers identifying Whiting-Turner's alleged violations as contributing to the accident. The record clearly includes "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion[]" that Whiting-Turner violated § 5-104(a) of the Labor and Employment Article by failing to install gooser braces and using an undersized spacer beam. *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119, 1123 (1978).

> **JUDGMENT OF THE COURT OF SPECIAL APPEALS IS REVERSED. COSTS TO BE PAID BY RESPONDENT.**

Judge Watts joins in judgment only.

17

Circuit Court for Baltimore County
Case No. 03-C-16-005006
Argued: November 29, 2018

IN THE COURT OF APPEALS

OF MARYLAND

No. 30

September Term, 2018

_____

COMMISSIONER OF LABOR AND
INDUSTRY

v.

THE WHITING-TURNER CONTRACTING
COMPANY

_____

Barbera, C.J.
Greene,
McDonald,
Watts,
Hotten,
Getty,
Adkins, Sally D.,
(Senior Judge, Specially Assigned)

JJ.

_____

Dissenting Opinion by Getty, J., which Adkins,
J., joins

_____

Filed: January 23, 2019

I respectfully dissent from the Majority's decision. Based upon the record before the Court, I believe that even if there was evidence to support the finding that the lack of gooser braces and use of undersized spacer beams were hazards, there was not substantial evidence to support a finding that such hazards were recognized by the industry. Thus, under OSHA precedent concerning general duty clause violations, the literature provided by Safway, the manufacturer, did not contain an explicit safety warning nor was there probative evidence of a hazard recognized by the industry that would trigger a violation of the general duty clause. Ultimately, the Majority's decision would permit provisions within a manufacturer's promotional materials, even absent explicit safety warnings, to exclusively control and supersede any construction decisions or plans by project engineers.

Throughout the opinion, the Majority painstakingly attempts to mischaracterize the brochure provided by Safway as an "assembly manual" or "installation instructions." Majority Slip Op. at 3, 4, 8, 11, 13, 14. However, the record clearly reflects that the brochure associated with promoting Safway's "Adjust-A-Shore" system is essentially promotional literature and does not constitute a step-by-step guide to assembling the product. Accordingly, a promotional brochure should not be given the same weight as an "assembly manual" because these two types of literature serve different and distinct functions.

The Majority notes that courts interpreting OSHA have indicated that a manufacturer's instructions containing explicit safety warnings "may be probative evidence in establishing a general duty clause violation." *Sec'y of Labor v. K.E.R. Enter., Inc.*, 23 BNA OSHC 2241 (No. 08-1225, 2013). Considering the facts of this case,

however, the Majority's holding that an instruction contained within a promotional brochure, that lacks any explicit safety warnings, may substantiate a general duty clause violation contravenes the Occupational Safety Health and Review Commission's ("the Commission") precedent on this issue. The Majority's reliance on *K.E.R. Enterprises* is misplaced, because there the Commission found that employees of K.E.R. Enterprises complied with warnings in the literature provided by the manufacturer. Majority Slip Op. at 13. Instead, the Commission concluded that the employees did not comply with all relevant installation instructions or warnings **within the industry**. While the Majority only notes the Sigma instructions provided by the manufacturer in *K.E.R.*, the Commission significantly relied upon separate warnings found within the American Water Works Association standard C-111 ("AWA standard"). *Sec'y of Labor v. K.E.R. Enter., Inc.*, 23 BNA OSHC 2241 (No. 08-1225, 2013). The AWA standard provided that "[i]f effective sealing is not attained at the maximum torque indicated, the joint should be dissembled, thoroughly cleaned, and reassembled. Overstressing bolts to compensate for poor installation practice is not acceptable." *Id.*

Thus, in *K.E.R. Enterprises*, the Commission found that "neither Sigma's installation instructions nor the AWA standard contain a safety warning or suggest a link between noncompliance and a safety hazard." *Id.* Accordingly, the Commission concluded that "Sigma's installation instructions and the AWA standard do not establish that *overtightening of the T-bolts* creates a struck-by hazard during a hydrostatic pressure test." *Id.* (emphasis added). The use of the term overtightening clearly indicates that, while K.E.R. employees may have complied with Sigma's installation instructions, they

2

did not comply with the AWA standard. The Majority's strained interpretation of *K.E.R. Enterprises* focuses exclusively on Sigma's installation instructions and neglects to consider the implications of the AWA standard in determining K.E.R.'s lack of compliance. In the case before us, no separate standard such as the AWA exists to justify a finding of a recognized industry hazard.

The Majority also relies on *F & H Coatings, LLC v. Acosta*, for the proposition that a general duty clause violation existed, because "[a]t its most basic, the condition involved elevating an incredibly heavy object, placing it on a set of racks, [and] allowing work to be performed on it without securing it against unexpected movement." 900 F.3d 1214, 1225 (2018). The Majority then likens such a scenario to the instant appeal and summarily concludes that "the act of raising a 42,800 pound concrete double-tee without installing gooser braces for stability and safety is clearly a hazard to those working underneath and in the proximity of the raised object." Majority Slip Op. at 12.

However, the decision in *F & H Coatings, LLC* is inherently distinguishable from the facts encountered in the present appeal. Here, Whiting-Turner supported the double-tees with the four shoring towers and four jacking towers, each capable of supporting up to 44,000 pounds. Unquestionably, the record supports sound engineering practices by Whiting-Turner dissimilar to the finding of "allowing work to be performed on it without securing it against unexpected movement." *F & H Coatings, LLC*, 900 F.3d at 1225.

With regard to the undersized spacer beams, the Majority points out that Dr. Jin testified that timber cribbing, as per Whiting-Turner's initial plans, would have been preferable. Majority Slip Op. at 14. The Majority goes on to point out that Dr. Jin testified

3

that the use of undersized spacer beams reduced the rigidity of the support system and concludes that "support became tenuous when a single corner was jacked, creating more pressure on the other towers." Majority Slip Op. at 15. However, the Majority fails to consider contrary evidence – including the KCE report which concluded that the "safety and jacking towers have adequate strength to support the load of the precast double[-]tee even if the entire load is concentrated in one location on the beam." Accordingly, KCE's report did not conclude that the use of undersized spacer beams contributed to the collapse.

Despite this, the Majority indicates that Whiting-Turner's plan to utilize timber cribbing evinces that Whiting-Turner had actual knowledge of the hazard associated with utilizing the undersized spacer beams. However, although Dr. Jin testified that the use of timber cribbing would be preferable, his report did not explicitly indicate that the collapse would not have occurred had Whiting-Turner utilized lumber cribbing. In this section of its discussion, the Majority conflates the use of timber versus steel cribbing with grounds for a general duty clause violation. As such, the Majority concludes that "Whiting-Turner had actual knowledge of the proper type of cribbing and spacer beams that should be used in a process like the one utilized here." Majority Slip Op. at 15. The question presented is not whether Whiting-Turner's failure to utilize timber cribbing constituted a general duty clause violation – but whether the use of undersized spacer beams does. The distinction between timber and steel cribbing should not be determinative in the Majority's analysis of whether this constituted a hazard recognized within the industry.

The Majority's decision today essentially allows literature provided by a manufacturer that is promotional in nature and not an "assembly manual" to be absolute in

4

terms of a general duty clause violation. Hereafter, a general duty clause violation will result for any entity or individual that attempts to deviate to any degree from literature provided by a manufacturer – even where the literature does not contain explicit safety warnings – a stark break from federal precedent involving OSHA, which this Court rightfully looks to for guidance when interpreting the Maryland Occupational Safety Hazard Act. *See Comm'r of Labor and Industry v. Bethlehem Steel Corp.*, 344 Md. 17 (1996); *Bethlehem Steel Corp. v. Comm'r of Labor and Industry*, 339 Md. 323 (1995).

Within the present case, Whiting-Turner tasked one of its engineers with devising a strategy to lift and remove the double-tees. In the future, corporate engineers will have no discretion when it comes to following steps set forth in literature provided by manufacturers and the engineers' hands will essentially be tied – regardless of whether the manufacturer's literature contains an explicit safety warning. Ultimately, when encountering literature from a manufacturer, even absent explicit safety warnings, engineers will be forced to defer to the manufacturer's recommendations – even in situations where the task is uniquely situated in a manner that may not necessitate strict adherence to the manufacturer's literature. Overall, the Majority's decision potentially eliminates discretion that engineers may have in tailoring equipment to specific projects and instead creates a standard that manufacturer's instructions are essentially the law of the land and strict adherence is necessary.

In addition, the reports by Dr. Jin and KCE are contradictory and fail to establish that either the failure to use gooser bracers or that the use of undersized spacer beams constituted recognized hazards. As mentioned above, in contrast to Dr. Jin's report, the

5

KCE report did not conclude that the use of undersized spacer beams contributed to the collapse. Further, both reports rely upon the Safway brochure to justify their conclusion that the lack of gooser braces contributed to the collapse and therefore constituted a recognized hazard. This is in sharp contrast with federal precedent interpreting OSHA, which requires that materials provided by a manufacturer contain explicit safety warnings or that there be probative evidence of a hazard recognized by the industry to establish a general duty clause violation. Thus, the record before us contains insufficient evidence to conclude, as the Majority does, that either Whiting-Turner's failure to utilize a gooser brace or its use of undersized spacer beams constituted a hazard recognized within the construction industry.

In conclusion, for the reasons presented above, I respectfully dissent from the Majority's decision and would affirm the judgment of the Court of Special Appeals.

Judge Adkins has authorized me to state that she joins in this opinion.